BORIS N. SOKOLOFF, Plaintiff, *v.* THE NATIONAL CITY BANK OF NEW YORK, Defendant.*

Supreme Court, New York County, July 11, 1927.

Banks and banking — depositor — action to recover amount paid defendant in this State to be transferred to Petrograd branch in Russia to open account — account was opened in Petrograd in 1917 — parties occupy position of creditor and debtor — plaintiff directed Petrograd branch to transfer credit to bank in Kharkoff — before transfer was made plaintiff canceled direction and directed Petrograd branch to hold money at disposal of plaintiff's sister — defense that payment was made by attempted transfer cannot be sustained — demand made by plaintiff's sister and rejected on ground that Petrograd branch had made transfer, is sufficient to entitle plaintiff to maintain action — Russian law that superior force may be pleaded as partial defense is, not applicable — fact that plaintiff cannot recover in Russia, is not defense — stipulation by plaintiff was election to sue for breach of contract — plaintiff is entitled to recover value of rubles on September 1, 1918, when American personnel in Petrograd branch left Russia.

The plaintiff, in June, 1917, paid to the defendant at its New York office $31,108.50, for the purpose of opening an account in defendant's Petrograd branch in Russia, and received therefor a receipt to the effect that the money paid represented the cost of rubles at twenty-three and one-quarter cents " which

---

* See, also, 119 Misc. 332; 208 App. Div. 627, and 239 N. Y. 158, 171.

are to be transferred to our Petrograd Branch to open his account." After the plaintiff had withdrawn part of the amount deposited in the Petrograd branch, he directed that bank to transfer the balance to the credit of the plaintiff in the Kharkoff Mutual Credit Society in Kharkoff, Russia. The method of transfer in use in Russia was by a system of credits and debits, the actual money not being transferred. Several days after the direction was given by the plaintiff, he ascertained that the transfer had not been made, and directed the Petrograd branch to cancel the transfer and hold the money subject to the disposal of plaintiff's sister. The transfer was never completed and the defendant's branch in Russia was finally confiscated by the so-called Soviet government.

The relation of the defendant to the plaintiff was that of debtor and creditor, and although the account was opened in a branch of the defendant in Russia, nevertheless the defendant remained liable for the deposit in case the Russian branch did not pay the money to the plaintiff.

The defense of payment, on the theory that the amount credited to the plaintiff's account in the Petrograd branch had been transferred at plaintiff's direction to his account in the Kharkoff Mutual Credit Society, cannot be sustained, for, until plaintiff was actually given credit in that society for the amount directed to be transferred, the transfer was incomplete, and since it appears that prior to that time the plaintiff canceled the direction for transfer and directed the defendant to hold the money subject to disposal by the sister of the plaintiff, it is held that the sum on deposit in the Petrograd branch was not paid.

The plaintiff had the right to revoke his original order at any time before the transfer of the credit was actually made.

The demand made on the Petrograd branch by the sister of the plaintiff for the money on deposit there, which demand was met by a refusal to pay the money to her on the ground that the plaintiff had directed the transfer thereof, is sufficient to satisfy the rule that an action cannot be maintained by a depositor against a bank until after a demand. It was not necessary for plaintiff's sister to present a check signed by the plaintiff for the amount on deposit.

It is not a defense, either partial or complete, to this action, that under the law of Russia a recovery cannot be had, for breach of contract, where performance is prevented by superior force, for this is an action to recover the money deposited and since no damages are claimed, the plaintiff having waived any claim to interest, the rule of the Russian law does not apply.

The fact that the plaintiff cannot recover his debt in Russia is not a defense to this action but rather an element of the jurisdiction of the Supreme Court of this State.

The complaint herein was held by the Court of Appeals to be equivocal, in that it cannot be ascertained therefrom whether plaintiff was proceeding on the theory of rescission or upon the theory of breach of a contract, and when the case came on for trial the plaintiff stated that he elected to rest upon the claim to recover the amount of rubles sued for at the valuation of the rate of exchange prevailing on the day of the breach of the contract. This stipulation is in fact an election by plaintiff to recover on the theory of a breach of contract.

The plaintiff is entitled to receive from defendant's branch in Russia the number of rubles on deposit there at the time the demand therefor was made, and the defendant not having paid the plaintiff, he is now entitled to recover their equivalent in dollars at the time they should have been paid. Plaintiff may recover the value of the rubles on September 1, 1918, the day when the defendant's American personnel left Russia.

ACTION on contract with defendant for purchase of Russian rubles.

*Morris Hillquit,* for the plaintiff.

*Shearman & Sterling* [*Carl A. Mead* and *W. Deering Howe* of counsel], for the defendant.

ALFRED R. PAGE, Referee.   The defendant is a national banking corporation organized under the laws of the United States, and having its principal place of business in the city of New York. A branch of the defendant was opened at Petrograd in Russia pursuant to permission granted by the Federal Reserve Act and by the Federal Reserve Board.   Before opening its branch in Petrograd, the defendant was required to and did obtain the permission of the Imperial Government of Russia, the then existing government, to operate the branch, which permission was given in the form of a charter, prescribing " Rules for the operation of the Russian Branches of the National City Bank of New York." A translation of this charter was annexed to the stipulation of the parties as to facts and marked Exhibit A.   The portions of the charter upon which counsel have laid stress are the following provisions:   That the said bank should maintain a special guaranty fund of 5,000,000 rubles in the State Bank, and in addition thereto all the real and personal property in Russia, and the capital and surplus of the bank should be a guaranty for the bank's liabilities in connection with its operations concluded in Russia.   (¶¶ I, II.) That litigations which may arise between the City Bank and private persons in consequence of operations in Russia " shall be within the jurisdiction of the Russian courts on the basis of the laws in force in Russia."   (¶ XXV.)   That " as regards the discontinuance of operations in the Empire, the Russian branches of the National City Bank of New York shall be subject to Russian laws and to the decrees of the Russian government, both those that are actually in force and such as may be promulgated in the future." (¶ XXVII.)

In the month of March, 1917, the Imperial government of Russia was overthrown and was superseded by the Provisional government of Russia, popularly known as the Kerensky government, which was recognized by the government of the United States as a government *de facto* and *de jure,* and was the last government of Russia recognized by the United States.   On June 27, 1917, the plaintiff, a Russian citizen, who was then residing in the city of New York, paid to the defendant at its head office in the city of New York, the sum of $30,225 and of $883.50 respectively, for which he received the following receipts dated on that day and signed in the name of the defendant by a duly authorized employee:

" Received from Boris N. Sokoloff thirty thousand two hundred twenty-five dollars representing the cost of Rs. 130,000 at 23¼

cents which are to be transferred to our Petrograd Branch to open his account," and

" Received from Boris N. Sokoloff eight hundred eighty-three 50/xx Dollars, representing the cost of rubles 3,800 00/xx at 23¼ cents for transfer to our Petrograd Branch."

Upon the receipt of the sums aggregating $31,108.50 from the plaintiff and the delivery to him of the above-mentioned receipts, the defendant credited to its record of its ruble account with its Petrograd branch 133,800 rubles and simultaneously or immediately thereafter the head office of the defendant advised its Petrograd branch by letter which read in part as follows: " Kindly charge our account 133,800 rubles and open an account on your books for a like amount in the name of Boris Nikolaevitch Sokoloff."

The specimen signature of the plaintiff was transmitted by the defendant's head office to its Petrograd branch with the letter of advice.

On or about August 21, 1917, the Petrograd branch debited its record of the ruble account with it of the head office with 133,800 rubles and opened a new account on its books in the name of the plaintiff, to which it made a corresponding credit of 133,800 rubles.

The plaintiff left the United States and arrived in Petrograd about September 1, 1917, and received from the Petrograd branch of the defendant a bank pass book of the branch in which was entered his deposit of 133,800 rubles. During the months of September and October, 1917, the plaintiff, from time to time, drew against said account, and on or about the end of October, 1917, there remained a balance of 120,370 rubles in his account in the defendant's Petrograd branch. All orders of the plaintiff on the said account up to that time were duly honored by the said branch.

On or about the 1st of November, 1917, the plaintiff then being in the city of Kharkoff, in the southern part of Russia, instructed the Petrograd branch to transfer 120,000 rubles of his account through the Russian State Bank to the Kharkoff Mutual Credit Society for his account. Upon the receipt of these instructions the Petrograd branch debited the plaintiff with the amount of the transfer and credited the same amount to the record of its account with the State Bank. The Petrograd branch then had a balance of many million rubles with the State Bank at Petrograd. At the same time the Petrograd branch passed the plaintiff's instructions on to the State Bank, Petrograd, and sent a debit advice to the plaintiff, which the plaintiff thereafter received. Three or five days after sending the instruction to transfer the 120,000 rubles the plaintiff inquired at the Kharkoff Mutual Credit Society and of

the branch of the State Bank at Kharkoff whether such transfer had been received at Kharkoff, and on being informed that it had not, he wrote a letter to the Petrograd branch of the defendant advising it that the Kharkoff Mutual Credit Society had not received the 120,000 rubles and requesting it to hold the funds at the disposal of his sister. Plaintiff also testified that at the same time he telegraphed to the Petrograd branch to the same effect. The request to cancel was received by the Petrograd branch, and it wrote to the plaintiff that it had acted on his first instructions and, therefore, was not in position to hold such funds at the disposal of his sister, as they were no longer in the possession of the branch.

On November 7, 1917, the Provisional government of Russia was overthrown by the Bolschevik Revolution, which established the so-called Soviet government, which has been in control of the city of Petrograd ever since its establishment and still controls the said city and all territories of the former Russian Empire as the same was constituted after the Brest-Litovsk peace.

About the middle of December, 1917, the plaintiff's sister called at the Petrograd branch with a letter from the plaintiff, stating that she was anxious to obtain the funds. She was informed by the person in charge of the said branch that the transfer of the 120,000 rubles had been made in accordance with plaintiff's original instructions, and that the defendant's branch accordingly no longer had the funds in its possession. The plaintiff's sister called once or twice more at the Petrograd branch in connection with said funds. After her first visit the Petrograd branch wrote to the State Bank inquiring whether the transfer of the 120,000 rubles for the account of the plaintiff had been made by it to the Kharkoff Mutual Credit Society, and if not, requesting a recrediting of the Petrograd branch with that amount. The State Bank replied in writing, in substance stating that it could not inform the said branch whether such transfer had been made as disorders had broken out between Petrograd and Kharkoff, and that for the moment the State Bank was not in communication with its Kharkoff branch; that it had issued instructions to the latter to make the transfer of said 120,000 rubles to the Kharkoff Mutual Credit Society. Later, and some time in the month of April or May, 1918, the Petrograd branch received a letter from the State Bank, to the effect that the latter had received information from its branch that the transfer to the Kharkoff Mutual Credit Society had not been made, upon which the Petrograd branch asked the State Bank to recredit its account with the 120,000 rubles. The Petrograd branch did not inform the plaintiff of the receipt of this letter.

The Russian State Bank at the times above mentioned was a government institution. On December 27, 1917, the Soviet government of Russia issued a decree purporting to merge all existing private joint stock banks and banking houses in the State Bank, that the method of effecting this merger shall be determined by a special decree, and that the temporary administration of the business of joint stock banks shall be intrusted to the council of the State Bank. On that date a squad of soldiers entered the premises occupied by the Petrograd branch, presented a copy of the decree and took possession. They remained for about five days and were withdrawn, with the understanding that the Petrograd branch would abide by the regulations that were imposed by the chief of the commissary of the State Bank of Russia, which were that the branch would limit its operations to calling in its loans and limit the payment, to all depositors except Americans, to 150 rubles a week, and to Americans to 500 rubles a day. The Petrograd branch thereafter operated in Petrograd subject to the said restrictions and limitations. On March 9, 1918, the American personnel of the Petrograd branch was forced to withdraw from Petrograd, owing to the approach of the German armies, the United States being then at war with Germany, and removed to Vologda, Russia. The non-American personnel remained in Petrograd and continued to operate in Petrograd subject to the restrictions and limitations imposed by the chief of the commissary of the State Bank. The American personnel of the Petrograd bank was arrested in Vologda on or about August 5, 1918, by the Soviet revolutionists, and forcibly removed to Moscow, and was thereafter forced by the Soviet revolutionists to leave Russia on or about September 1, 1918.

While the American personnel was in Vologda during the month of March, 1918, a letter was mailed to the depositors in which they were asked to withdraw any balance that they might have to their credit with the defendant's Petrograd branch, in view of the unsettled conditions then prevailing in Russia, and the uncertainty of the defendant's continuance in Russia. In May, 1918, another letter was sent to all the depositors who had not answered the previous letter, stating that they would have to withdraw their balances. From September 1, 1918, until December 16, 1918, one Heuts, a subject of Holland, was in charge of the Petrograd branch. On December 16, 1918, there appeared a squad of soldiers with an order from the head of the committee on conflict between labor and capital, to the effect that the premises had all been requisitioned by the Fifth Army Corps of the Red army, with the exception of one small room, which Mr. Heuts

Supreme Court, July, 1927.    [Vol. 130

occupied until January 20, 1919, when he was forcibly ejected by the soldiers, and they moved their barracks into the premises.

During the period from September 1, 1918, to January, 1919, Mr. Heuts had in his possession about 29,000 rubles, and he collected 25,000 rubles from one debtor, most of which was paid out for current expenses, 6,090 rubles of which were paid out to depositors. Mr. Heuts was instructed that if any demands were made for substantial amounts, he should communicate with the defendant's branch at Stockholm, Sweden, for instructions. The defendant also claimed that it could have made payments to depositors through the Moscow Narodna Bank. The defendant had no balance in the Moscow Narodna Bank, but the said bank would cash checks drawn by the defendant's Petrograd branch on the State Bank. One purpose of leaving Heuts in charge of the Petrograd branch was to comply with the requirement of the charter that some one authorized to accept service of process should be at all times present at said branch.

On December 29, 1918, the Soviet government purported to issue a decree " nationalizing " all private banks, and merged them into the People's (State) Bank, and thereby confiscated all the assets of the Petrograd branch of the defendant.

The defendant claims that under the contract made with the plaintiff the defendant's head office in New York undertook only two things: (1) To sell the plaintiff rubles at twenty-three and one-quarter cents, and (2) to transmit them to its Petrograd branch, which was completely performed; that when the plaintiff received a pass book from the defendant's Petrograd branch, a new contract relation between himself and the Petrograd branch was made to be performed in Russia; that the plaintiff only had such rights against defendant as he would have against any Russian bank.

The contract, however, was not for the sale and transmission of rubles. The plaintiff deposited with the defendant the sum of $31,108.50 which represented the cost of 133,800 rubles with which an account with the plaintiff was to be opened in the Petrograd branch of the defendant. There were not two contracts made, one with the defendant in New York and the other with the Petrograd branch in Russia. There was only one contract made with the defendant in New York which was to be carried out in part by the agency of the defendant's Petrograd branch. Pursuant to the defendant's instructions the Petrograd branch opened an account in the name of the plaintiff and credited to it the 133,800 rubles on or about the 21st day of August, 1917. It was not until some time in September of that year that the

plaintiff arrived in Petrograd and received his pass book, with the credit of the deposit theretofore noted therein.

Upon the deposit of the dollars with the defendant's head office the usual relation of banker and depositor, that is, of debtor and creditor arose (*Sokoloff* v. *National City Bank*, 208 App. Div. 627, 629), with this qualification, that instead of the dollars being payable on demand at the head office, they were payable in the then equivalent value of rubles, the legal currency of Russia, at the defendant's Petrograd branch. As the contract was to pay on demand at its Petrograd branch, the plaintiff could not demand payment elsewhere; there was, therefore, necessarily an implied obligation on the part of the defendant that it would maintain its branch in Petrograd where such demand could be made. (*Sokoloff* v. *National City Bank*, 119 Misc. 332, 334.)

Where a bank maintains branches, each branch becomes a separate business entity, with separate books of account. A depositor in one branch cannot issue checks or drafts upon another branch or demand payment from such other branch, and in many other respects the branches are considered separate corporate entities and as distinct from one another as any other bank. (*Chrzanowska* v. *Corn Exchange Bank*, 173 App. Div. 285; *Pan American Bank & Trust Co.* v. *National City Bank*, 6 F. [2d] 762, 767; *Woodland* v. *Fear*, 7 El. & Bl. 519; U. S. Comp. Stat. 9745; Federal Reserve Act, § 25.) Nevertheless, when considered with relation to the parent bank they are not independent agencies; they are, what their name imports, merely branches, and are subject to the supervision and control of the parent bank, and are instrumentalities whereby the parent bank carries on its business, and are established for its own particular purposes, and their business conduct and policies are controlled by the parent bank, and their property and assets belong to the parent bank, although nominally held in the names of the particular branches. (*United States Bank* v. *Goddard*, 5 Mason, 366.) Ultimate liability for a debt of a branch would rest upon the parent bank.

The fact that for the privilege of doing business in Russia the defendant was required to take out a charter for its Petrograd branch and submit to certain regulation as to the method of conducting its business, did not alter the relation of the Petrograd branch with the defendant. So long as it conducted its business in Russia, it was subject to such regulation. When, however, it closed its Petrograd branch, it became liable to this plaintiff under and by virtue of the contract which it had made with the plaintiff in New York. In this case we are not concerned with questions of liability for transactions originating in Russia and wholly to be per-

formed in Russia, but with a debt incurred in this State which the defendant agreed to pay on demand at its own branch in Petrograd.

The defendant did pay on the plaintiff's demand various amounts, and reduced the amount on deposit to 120,370 rubles, and claims that it has paid to the plaintiff 120,000 rubles by attempting to transfer that amount to his credit with the Kharkoff Mutual Credit Society, pursuant to the plaintiff's direction. In this connection we must take into consideration the banking practice which then obtained in Russia. Transfers were made by what was called the " Giro system," which was a system of mutual accounts which were kept between banks, whereby, instead of the sending of money or checks, they would by debits and credits on these accounts, effect a transfer of the credit in the customer's account from one bank to the credit of his, or his designees, account in another bank. This system was established by the State Bank in Petrograd which was a government institution and had branches in almost every town and hamlet in Russia. When the plaintiff desired to transfer 120,000 rubles from his account in the Petrograd branch to his credit in the Kharkoff Mutual Credit Society, in which he then had an account, he asked instructions from the manager of that society as to the method to be pursued to make the transfer, and was advised to write to the Petrograd branch of the National City Bank to transfer the amount through the State Bank, and that the transfer would be made through the Kharkoff branch of the State Bank to the Kharkoff Mutual Credit Society and credited to plaintiff's account. The manager gave plaintiff the number of the society's account in the Kharkoff branch of the State Bank. Plaintiff, pursuant to these instructions, wrote to the Petrograd branch of the defendant to make the transfer by telegraph, giving the number of the Kharkoff Mutual Credit Society's account with the branch of the State Bank in Kharkoff.

In the usual course of business the defendant's Petrograd branch would have charged the plaintiff's account with the 120,000 rubles and credited the State Bank and advised the State Bank of the transaction and would have given instructions to telegraph to the Kharkoff branch to make by a debit and credit entry a transfer to the Kharkoff Mutual Credit Society for plaintiff's account. But the transaction was never consummated. The State Bank never communicated with its Kharkoff branch with respect to this transaction. When the plaintiff discovered, in a few days after he had given the direction, that the transfer had not been made by the State Bank, he wrote and telegraphed to the Petrograd branch, rescinding his order and directing it to hold the rubles at the disposal of his sister.

I have examined with care the large number of cases that have been cited by counsel from which it is sought to apply by analogy, transactions for the collection of notes, checks, drafts and transactions in foreign exchange, in which facts were present which distinguish this case and a discussion of them would serve no useful purpose.

In this case the transaction is directly between the plaintiff and the defendant, unembarrassed by the rights of others. The credit on the books of the Petrograd branch to the account of the State bank was not a transfer of the amount of the rubles to the general fund of the State Bank, which could be applied to the account of the defendant. It was a transfer by a bookkeeping entry of those rubles for the specific purpose of effecting a transfer through the Kharkoff branch of the State Bank, and by the latter by transfer to the Kharkoff Mutual Credit Society, and until the amount of the rubles became available to the plaintiff in the latter bank, the transaction was not executed, in any sense, but remained executory. By crediting the account of the State Bank, the plaintiff secured nothing which would pass for money or which would be available to him until through the various transfers the credit was established for him in the Kharkoff Mutual Credit Society. The State Bank had no right to appropriate this credit to anything but the specific purpose for which it was established; it was merely an agent through which the transfer was to be made. The Petrograd branch parted with nothing, no cash was paid, only bookkeeping entries were made, which transferred a credit from one account on its books to another, and when it found that the State Bank had not made the transfer, it was not necessary for the State Bank to take the initiative in recrediting the defendant's account, for until it had transferred the credit it was not properly chargeable against the Petrograd branch. There had been no settlement between these banks, in which this transaction had entered. The transaction was not in any sense nor at any stage an executed one, but was executory, and the plaintiff was entitled to revoke his order for the transfer, and no one would suffer thereby. The plaintiff had received nothing; therefore, there was nothing for him to restore. The defendant had parted with nothing; the 120,000 rubles were in its possession; by a mere bookkeeping entry it had transferred the credit which evidenced their receipt from one account to another, which could be rectified by bookkeeping entries; the State Bank, until it acted upon the direction to transfer the credit, had not in any way changed its position because of the advice of the credit on the books of the Petrograd branch, and, therefore, was in no position to object to the credit being canceled.

Among the numerous cases that I have examined, the case that comes the nearest to the case at bar is *Gravenhorst* v. *Zimmerman* (236 N. Y. 22), and in my opinion the principles therein stated apply to the facts of this case. In the *Gravenhorst* case money was paid to the defendant to create a credit in marks for a certain person in the Deutsche Asiatic Bank, Berlin, through the Deutsche Bank, Berlin, by wireless. Immediately upon receipt of the money the defendants delivered to the wireless telegraph company a message to the Deutsche Bank in Berlin where they had an account instructing said bank to pay to the Deutsche Asiatic Bank of Berlin for the account of the designated person the sum of marks in question. Owing to war conditions the message and the confirmatory letter were not delivered until nearly three years later. The court held this to be an executory and not an executed transaction, and that the plaintiff had the right to make a prompt rescission. The court commented on the fact that as the credit was to be effected by wireless it imported haste; that " the intent of the parties was speed; delay meant probable loss and it is well settled that where the contract of the parties fairly leads to the inference that time is an essential consideration and feature, enforcement of this feature will be given although the contract does not explicitly specify it." (P. 35.) In the case at bar the transfer was to have been made by telegraph, and the plaintiff, on learning that the transfer had not been made, promptly rescinded his order. That there was need for haste was shown by subsequent events.

In the *Gravenhorst* case the amount to be transferred by wireless was paid to the defendants. In the case at bar the plaintiff directed his general depository to transfer the credit through the State Bank. This made the defendant the agent of the plaintiff to effect the transfer, and as to this amount the relation was not that of debtor and creditor but of principal and agent. (*City of St. Louis* v. *Johnson*, 5 Dill. 241, 250–252.) The State Bank was also merely an agent for the transmission of the credit. The claim was made in the *Gravenhorst* case that by the custom in the city of New York, which was well understood by the parties, the wireless company and the United States Post Office became the agents of the purchaser and not of the seller, and the delivery of the message and the posting of the letter constituted delivery by the purchaser to the seller and discharged the seller from further liability. The court, however, held this to be untenable. In the case at bar the claim is made that the State Bank was the agent of the plaintiff and that the defendant did all that it was required to do when it credited the amount of the 120,000 rubles to the account of the State Bank and gave the direction for the transfer,

and that the defendant is not liable for the failure of the State Bank to carry out the plaintiff's instructions. The defendant's counsel relies upon the case of *Myers* v. *Brown* (142 App. Div. 658; affd., 206 N. Y. 718). The plaintiff Myers was the assignee of the First National Bank of Denver, to which had been delivered a cablegram allegedly from one of its depositors asking for a telegraphic transmissal of $5,000 to him at Tokio, Japan. The First National Bank of Denver telegraphed Brown Brothers & Co., the defendants: " Pay $5,000 to Yokohama Specie Bank, Tokio, Japan, by telegram for credit of J. J. Brown, upon satisfactory identification * * *." Upon receipt of this telegram the defendants arranged with the New York agency of the Yokohama Specie Bank to transmit the money. A cablegram was sent by the agency to the Yokohama Specie Bank to make the payment requested, but the words " upon satisfactory identification " were omitted, and the money was paid to an impostor, who had sent the forged cablegram and impersonated J. J. Brown. The court stated in the course of the opinion: " The regular correspondent of Brown Brothers & Co. in Tokio at that time was the Hong Kong and Shanghai Banking Corporation, and, in cases of transfer of money by cable to Tokio, where no special instructions were given by the remitter of the funds directing through what bank said transfer should be made, such transfer would have been made by the defendants through the said corporation. * * * In my opinion, by the telegrams and letters, plaintiff's assignor, the Denver Bank, chose the Yokohama Specie Bank at Tokio as its agent to make the payment and directed the defendants to pay to said bank the $5,000 with instructions to the Yokohama Bank to pay J. J. Brown." (Pp. 660, 663.) Thus the contract had been fully executed, the money transmitted and paid to an impostor and not to the intended payee, while in the instant case the contract was executory and nothing had been appropriated to the credit of the plaintiff, nor had the defendant or the State Bank paid out anything. As we have heretofore stated, the 120,000 rubles remained in the possession of the defendant; the credit for them had been transferred from the plaintiff's account to the account of the State Bank for the specific purpose of having the credit established in the Kharkoff Mutual Credit Society for the plaintiff. Had the State Bank transmitted the instructions to its Kharkoff branch, and that branch had credited the account of the credit society with it but given instructions to credit some other account than plaintiff, there would have been some similarity between these cases. In the instant case, before the State Bank had made the transfer to its Kharkoff branch, the instruction to

make the transfer was revoked, and the transaction never passed beyond its first step. Furthermore, it was not proved in the instant case that the defendant had a regular correspondent in Kharkoff through which it would have transmitted the credit if the plaintiff had not directed it to have been made through the State Bank. The defendant proved that it had a substantial balance in the Volga Kama Commercial Bank which had a branch in Kharkoff, and that the transfer *could* have been made by the Giro system through that bank. The witness, however, testified that the Petrograd branch had only a few transfers to Kharkoff and that he could not recall that any had been made through the Volga Kama Commercial Bank. This was far from proving that if it had not been for the instruction to transmit through the State Bank it *would* have made the transmission through the Volg Kama Commercial Bank. In my view of the case it makes no difference whether the State Bank was the agent of the plaintiff or the defendant. This is not an action to recover for the neglect of the State Bank for failure to transmit. If it was, then the question for whom the State Bank was the agent would be of importance. The defendant was the agent of the plaintiff to make the transfer. Until the State Bank had made the transfer the direction for the transfer was revocable by the plaintiff. We need not discuss the neglect of the defendant to act promptly, for it did notify the State Bank of the revocation of the direction to transfer the credit before the State Bank had made the transfer and requested a recrediting of the amount that had theretofore been charged to the Petrograd branch. Even if there was some excuse for the delay, until the State Bank notified the defendant that the transfer had not been made, there was no reason why the books of the defendant should not have been corrected and the account of the State Bank charged with the 120,000 rubles and the plaintiff's account credited with that amount of rubles.

In no event, in my opinion, can this transaction be treated as a payment of the debt. The plaintiff has not received anything, nor has the defendant parted with anything. To constitute payment of a debt payable in money, there must be a delivery by the debtor or his representative to the creditor or his representative of money or some other valuable thing for the purpose of extinguishing the debt and which is received by the creditor for the same purpose. (*Kingston Bank* v. *Gay*, 19 Barb. 459, 460; *Persons* v. *Gardner*, 122 App. Div. 167, 170.) The State Bank was not the agent or representative to receive 120,000 rubles in payment, but merely for transmission of a credit for that amount. Until the 120,000 rubles were credited to the plaintiff's account, and thus made available

to him, he received nothing in satisfaction of his debt.    Until the State Bank, through its Kharkoff branch, established the credit to the plaintiff's account the State Bank was not entitled to the credit on the books of the Petrograd branch.    The entry having been made with the expectation that the State Bank would establish the credit, that entry was purely provisional, and when the plaintiff informed the defendant that the transfer had not been made and revoked the order, and certainly when the State Bank informed the defendant that the transfer had not been made, the credit should have been canceled by a reverse of the original entries.

The learned counsel for the defendant argues that the book entries made by the bank in connection with this attempted transfer of the Giro system had the same effect as if a check or draft upon the State Bank had been delivered by it to the plaintiff, as would have been done under the banking practice in this country.    The distinction, however, is that the purchase of a check or draft is a completed transaction.    The plaintiff would have received a written instrument for the payment of money and which is regarded as its equivalent, and such a transaction results in an executed purchase of the draft or check.    An order for a transfer of a credit accomplishes no such result.    The plaintiff received nothing which would pass for money or which will enable him to obtain the credit except through the action of the defendant and the State Bank in establishing the credit in the Kharkoff Mutual Credit Society.    The transaction is executory and not executed.    (*Gravenhorst* v. *Zimmerman,* 236 N. Y. 22, 31, 32.)    On information that the transaction had not been consummated, the Petrograd branch could and should have recredited the plaintiff's account.    Even where a check has been credited to a depositor's account, so that he could draw against it, if the check is not in fact paid, the bank can charge it back to the depositor's account. (*Lyons* v. *Union Exchange Nat. Bank,* 150 App. Div. 493, 495.)    Or where a draft is forwarded for collection and credited as paid, but in fact later discovered not to have been paid, the entry may be reversed.    (*National B. & D. Bank* v. *Hubbell,* 117 N. Y. 384, 393.)    Until the transaction is finally consummated and cash or its equivalent made available, any entry in advance made on the supposition that the transaction will be fully executed, if it later transpires that the thing upon the expectation of which the entry was based had not happened, and the transaction has not been executed, is an erroneous entry which should and could have been corrected.

It is argued that until the State Bank recredited the account of the Petrograd branch on its books the Petrograd branch could not

reverse the entries on its books and recredit the rubles to plaintiff's account.

There is no proof whether the State Bank made the proper entries on its books, and it is immaterial under the facts whether it did or not. There has been no settlement between it and the Petrograd branch in which this transaction entered; hence the defendant has not been deprived in any way of anything by reason of the transaction.

The defendant further claims that no demand was made for payment. The law is well settled that the relation between a bank and a depositor is that of debtor and creditor, but as the bank has agreed to pay upon the demand or the order of the creditor, no cause of action accrues in behalf of the depositor without a previous demand. The demand furthermore must be made at the banking office and during banking hours. But this rule does not extend to cases where the bank has disclaimed liability, or where for any other reason the demand would manifestly be futile. (*Pratt* v. *Union National Bank*, 79 N. J. Law, 117; *Holden* v. *Farmers & Traders National Bank*, 77 N. H. 535.)

In the case at bar the plaintiff, as soon as he discovered the transfer had not been made, wrote and telegraphed to the Petrograd branch, notifying it that the transfer had not been made, and requested it to hold the funds at the disposal of his sister. In response to this request the Petrograd branch wrote to the plaintiff that it had acted on his first instructions and, therefore, was not in a position to hold such funds at the disposal of his sister. Thereafter, about the middle of December, 1917, the plaintiff's sister called with a letter from plaintiff, stating that she was anxious to obtain the funds. The person in charge of the Petrograd branch reiterated the statement that had been communicated to the plaintiff. When the defendant was informed by the State Bank that the transfer had not been made, it did not change its position theretofore taken, and still claims that it was right in so doing, and predicates one of the defenses upon its non-liability because of the alleged payment of these rubles to the State Bank. Under the circumstances, it was not necessary for the plaintiff's sister to go through the idle formality of filling out the blank check which the plaintiff had sent her and presenting it for payment. No objection was made, on the ground that she did not present a check or that the instruction that the Petrograd branch had received, together with the letter which she presented was insufficient to warrant it in paying. If it was the intent or purpose of the bank to insist, before honoring the demand or paying the money, that she should present a check signed by the plaintiff,

the bank should then have made that objection. The fact of the disclaimer of liability in the instant case is much more clearly established than in the case of *Delahunty* v. *Central National Bank* (37 App. Div. 434, 436), in which the court said: " Where, however, the bank by refusal, or by an appropriation of the money, or any other act, shows an indisposition to honor a demand, the cases hold that under such circumstances a demand is unnecessary. So, too, if ' when a demand is made, a specific objection is made as a reason for not complying with the demand, all other objections, which if made might be readily obviated, are waived. And where the demand is not made of the proper person, or in the proper manner, or is made by the wrong person, objection should be taken at the time.' (5 Am. & Eng. Ency. of Law [1st ed.], 528g)."

There was no further opportunity to make an effective demand. The promulgation of the decree by the Soviet authorities on December 27, 1917; the occupation of premises of the Petrograd branch by Soviet soldiers on that day; their withdrawal on the understanding that the bank would abide by the regulations which were imposed by the chief of the commissary of the State Bank of Russia, among which was the inhibition of payment to any of the depositors, except Americans, of more than 150 rubles a week; all of these happenings rendered it impossible for the defendant to pay on demand, at its banking office in Petrograd, 120,370 rubles; therefore, during this time such a demand would have been futile. The subsequent withdrawal of the American personnel, owing to war conditions, on March 8, 1918, their arrest and enforced removal from Russia on September 1, 1918, ended the operation of the Petrograd branch as a bank of deposit. The very limited operations of Heuts have no bearing on the issues in this case, because he concededly did not have sufficient funds to pay plaintiff on demand, nor would he have been allowed by the Soviet authorities to do so if he had had such funds at his command. The letters written to depositors urging them to withdraw their deposits do not affect the plaintiff's claim because at no time had the defendant signified its willingness to pay to the plaintiff the 120,000 rubles or in any manner reversed its position that it had theretofore taken, that it was not liable for that amount. In my opinion, therefore, there was no necessity for plaintiff to prove a more formal demand than that contained in his letter presented by his sister to the Petrograd branch in order to enable him to bring his action.

The defendant pleads first as a complete defense and second as a partial defense, that the agreement between the plaintiff and defendant was made and to be performed in Russia; that the laws of Russia then and now provide that where the performance of a

contract is prevented by superior force, which it is impossible for that party to resist and which was caused by no fault of his, that party is excused from performance in Russia and is not responsible in damages for failure to perform; that such superior force excusing performance may consist in popular or political disturbances, and that .the Bolshevik revolution and the superior force exercised by the revolutionists rendered it impossible for the defendant to maintain its branches in Russia or to pay to the plaintiff in Russia any rubles to which he may have been entitled.

In support of this defense there was offered in evidence section 684 of the General Code of the Russian Empire, two decisions of the Civil Cassation Department of the Ruling Senate of Russia, the highest court of appeal of the Empire, known as Decision No. 1 of 1906 and Decision No. 1 of 1907. Boris Brasol, an eminent Russian lawyer, whose qualification was admitted, testified that the decisions of this court have the force of binding precedents in Russia; that ·these decisions extend the provisions of section 684 of the General Code of Russia to cover riots, revolutions and civil commotions, and he also testified in response to a hypothetical question that, under this statute, *force majeure* would be a defense to a bank against any claim from a depositor for damages owing to the inability of the bank to pay deposits to a depositor during the existence of the revolutionary conditions. He further testified that after the condition of *force majeure* ceased to exist, the bank would be· liable to the depositor for the amount of his deposit. In other words, that while *force majeure* would excuse a debtor from liability for damages for delay caused thereby, it would not discharge the debt.

The plaintiff has stipulated upon the hearing before me that he waived any claim for interest prior to September 1, 1918, the date when the bank employees left Russia.

The action, however, is not brought to recover damages alleged to have been caused by the delay in paying the money, and the only damage that could be recovered for withholding the money would be interest. Plaintiff's waiver of any claim to interest prior to September 1, 1918, disposes of this defense, and it is not necessary to determine the effect of the Russian law. This action is brought to recover the debt and not for damages for failure to pay during a period when it is claimed the defendant's Petrograd branch was prevented from paying by an alleged *force majeure*. In this case the Court of Appeals has held (239 N. Y. 158) that the decrees of the Soviet government nationalizing the banks of Russia with the accompanying seizure of their assets, have no force and effect as acts of sovereignty, in our courts, for the reason that the govern-

ment of the United States has refused to recognize the Soviet Republic as the government of Russia *de facto* or *de jure*. The confiscation of the assets in Russia by this unrecognized government has no other effect, in law, than seizure by bandits or by other lawless bodies. The court, in the course of its opinion, said: " But the ending of its Russian business was not the ending of its duty to make restitution for benefits received without requital. As to this, there would be no dispute if its assets had been left intact. The situation in a legal aspect is not changed by the fact that the property of the Russian branch has been scattered or despoiled. Plaintiff did not pay his money to the defendant, and become the owner of this chose in action, upon the security of the Russian assets. He paid his money to a corporation organized under our laws upon the security of all its assets, here as well as elsewhere. Everything in Russia might have been destroyed by fire or flood, by war or revolution, and still the defendant would have remained bound by its engagement."

The fact that the plaintiff cannot recover his debt in Russia is not a defense to this action but rather an element of the jurisdiction of this court.

The Court of Appeals on the motion for reargument (239 N. Y. 171) stated that " The complaint is equivocal. If it is based upon the theory of rescission with an accompanying right to restitution, the recovery must be measured by the money paid by the plaintiff for which no equivalent has been received (2 Williston on Sales [2d ed.], sec. 600, pp. 1503, 1505, 1506; 2 Sedgwick on Damages, sec. 733 A). If it is based upon the theory of the breach of an outstanding contract, we assume, though we do not decide, that the recovery must be measured by the value of the rubles. In that view, the election made or permitted at the trial will determine the result."

Upon this case being called for trial at Trial Term, Part X, the counsel for the plaintiff stated to the court: " Plaintiff elects to rest upon the claim to recover the amount of rubles sued for, at the valuation of the rate of exchange prevailing on the day of the breach of the contract, which we will prove was about 13 cents."

Thereafter the minutes state: " Both sides appearing by their respective counsel, in open court after the facts had been stated, waived the jury and consented to have the case referred. The election made by the plaintiff to apply on the reference."

The plaintiff's counsel states in his brief that he did not intend by such stipulation and does not waive any right to recover on the theory of rescission; whether he is entitled to recover the proportionate part of the dollars for which he has not been repaid

in rubles or whether he is entitled to recover only the value of the rubles in his deposit, is a question of law to be decided by the referee. He contends that the effect of the stipulation is merely to limit his recovery to the rate of thirteen cents per ruble even if the referee should find that as a matter of law he is entitled to recover at the rate for which he paid for the same; that is, twenty-three and one-quarter cents per ruble; in other words, that the plaintiff consented to accept a judgment on the basis of thirteen cents per ruble, whether the judgment is based on the rescission of the defendant's original contract made in New York under which the plaintiff paid to it twenty-three and one-quarter cents per ruble, or on the theory of defendant's breach of its contract arising from the opening of plaintiff's account in its Petrograd branch or both.

If such was the intention of the plaintiff, it should have been more clearly expressed. The defendant had the right to demand that the plaintiff elect between two inconsistent rights of action, whether he claim to recover back that which he had paid, upon a rescission of the contract for a failure of consideration, or whether for damages for breach of the contract. The defendant certainly was justified in the belief from the language used that the plaintiff was making an election between inconsistent remedies and not a mere concession as to the value to be given to the ruble. The plaintiff's counsel used the words " elects " and the " day of the breach of the contract," and the court and counsel for defendant both understood that he was stating his election to recover on the theory of a breach of the contract, and I shall not give it any different interpretation.

The defendant refused to pay the amount of 120,370 rubles, the balance remaining on deposit with it when the plaintiff's sister presented his letter, claiming that it had paid out the money. It did not ask a delay until it could satisfy itself that the State Bank had not established the credit, which might have presented a reasonable excuse for delay.

The question of the measure of damages presents a most serious question, and one on which the decisions are very conflicting. In many it was held that where the debt is payable in a foreign country in the money of that country, and the action is brought in this country, the judgment must be given in this country in United States currency, the damages should be computed in the currency of the foreign country and that the value of such amount of foreign currency shall be translated into dollars at the rate of exchange prevailing at the date of the judgment. In others it is held that the value of the foreign currency at the date of the trial controls. In others, that the date of the commencement of the

action is the date to be taken into consideration, while still others hold that the date of the breach of the contract is the proper date for the computation to be made. This question has become important since the World War, the effect of which was the depreciation of the currency of the countries engaged therein and the fluctuating rates of exchange between such countries and the United States. The learned counsel for the parties herein have included in their briefs references to a large number of these cases, and many more will be found collated and discussed in a note in the Harvard Law Review (Vol. XL, p. 620). I have examined these authorities and some others. In my opinion the recent decisions of the United States Supreme Court have clarified the principle to be applied in the instant case.

In *Deutsche Bank* v. *Humphrey* (272 U. S. 517) a citizen of the United States deposited money, payable on demand, in a German bank in Germany, and demanded it on or about June 12, 1915; the money was not paid and the suit was begun on July 9, 1921, under the Trading with the Enemy Act. The debt was a debt in German marks. The lower courts held that it should be translated into dollars at the rate of exchange existing when the demand was made (*Miller* v. *Humphrey*, 7 F. [2d] 330). The value of the mark fell after that date. The United States Supreme Court held that as the obligation arose from the German law alone, the courts of this country ought to enforce no greater obligation than exists by that law at the moment when the suit was brought. That " a dollar or a mark may have different values at different times but to the law that establishes it it is always the same. If the debt had been due here and the value of dollars had dropped before suit was brought the plaintiff could recover no more dollars on that account. A foreign debtor should be no worse off."

In *Zimmermann* v. *Sutherland* (274 U. S. 253; N. Y. L. J. June 1, 1927, p. 1) the plaintiffs before the outbreak of the World War were depositors in the Wiener Bank Verein of Vienna, Austria, and had a large amount of kronen to their credit. The suit was brought under the Trading with the Enemy Act, and sought to recover the amount of kronen on deposit as of April 6, 1917, at the average call rate of exchange for the month preceding the outbreak of the war between the United States and Austria. Under the laws of Austria, if a debt could not be paid because of dissatisfaction with the offer or other important reasons, the debtor might deposit in court the subject-matter of the dispute, and that if legally carried out, and the creditor was informed, this measure should discharge the debtor and place the subject-matter at the risk of the creditor. The plaintiffs not being satisfied with what

the Wiener Bank was willing to do, the bank deposited the kronen stated to be due in the proper court, notified the plaintiffs and plead the Austrian law and the deposit as a defense. The United States Supreme Court in affirming the decree for the defendant said: " The only primary obligation was that created by the law of Austria-Hungary and if by reason of an attachment of property or otherwise the courts of the United States also gave a remedy the only thing that they could do with justice was to enforce the obligation as it stood, not to substitute something else that seemed to them about fair." And further held that the deposit discharged the debt and was substituted for it as the only object of the creditor's claim.

In *Hicks* v. *Guinness* (269 U. S. 71, 80) a German firm was indebted to an American firm under an account stated for 1,079.35 marks. The debt was not paid when the war began. The Alien Property Custodian had taken property of the German firm of a greater value than the debt, and the American firm brought this suit in equity to recover what was due it, as provided by the Trading with the Enemy Act. The questions raised were whether interest should be allowed for the time covered by the war, and at what date the value of the mark should be estimated in dollars in order to fix the amount of the decree. Mr. Justice HOLMES, who wrote the opinions in the two cases last above cited, wrote the opinion in this case and said: " We are of opinion that the courts below were right in holding that the plaintiffs were entitled to recover the value in dollars that the mark had when the account was stated. The debt was due to an American creditor and was to be paid in the United States. When the contract was broken by a failure to pay, the American firm had a claim here, not for the debt, but, at its option, for damages in dollars. It no longer could be compelled to accept marks. It had a right to say to the debtors ' You are too late to perform what you have promised, and we want the dollars to which we have a right by the law here in force. ' *Gould* v. *Banks*, 8 Wend. 562, 567. The event has come to pass upon which your liability becomes absolute as fixed by law.' *Globe Refining Co.* v. *Landa Cotton Oil Co.*, 190 U. S. 540, 543. There is no doubt that this rule prevails in actions for a tort, *Preston* v. *Prather*, 137 U. S. 604, and in actions for the failure to deliver merchandise. *Hopkins* v. *Lee*, 6 Wheat. 109. The principle is the same in a contract for the payment of marks. The loss for which the plaintiff is entitled to be indemnified is ' the loss of what the contractee would have had if the contract had been performed,' *Chicago, Milwaukee & St. Paul Ry. Co.* v. *McCaull-Dinsmore Co.*, 253 U. S. 97, 100; it happens at the moment

when the contract is broken, just as it does when a tort is committed, and the plaintiff's claim is for the amount of that loss valued in money at that time. The inconveniences and speculations that would be the result of a different rule have been pointed out in arguments and decisions, and on the other hand the momentary interest of the country of the forum may be in favor of taking the date of the judgment, but the conclusion to which we come seems to us to flow from fundamental theory and not to need other support. It is in accord with the decisions of several State Courts and Circuit Courts of Appeals as well as of the English House of Lords. *Hoppe* v. *Russo-Asiatic Bank,* 235 N. Y. 37. *Katcher* v. *American Express Co.,* 94 N. J. L. 165, 171. *Simonoff* v. *Granite City National Bank,* 279 Ill. 248, 255. *Wichita Mill & Elevator Co.* v. *Naamlooze &c. Industrie,* 3 F. (2d) 931; *S. S. Celia* v. *S. S. Volturno,* [1921] 2 A. C. 544."

The distinction, therefore, is this: Where the cause of action arose exclusively in the foreign country and the jurisdiction of our courts is secured merely because the debtor has been served or his property has been attached in the state of the forum, the courts here will only grant that relief that the creditor could have secured if the action had been brought in the courts of that country; but where the jurisdiction of our courts was sought to enforce rights which arose under our laws, then the relief would be granted as of the time when the liability accrued under our laws. The decisions in this State are in harmony with the above rule.

In the instant case the contract was made in this State. The defendant undertook to pay, on demand, in Russia, in rubles. It refused and wholly failed to pay rubles in Russia and removed its branch from Petrograd, at which place it had agreed to pay. The only forum that was open to the plaintiff to assert his rights was our courts. The defendant offers now to pay the rubles, but it is too late; it could have paid them in Russia, but it cannot compel the plaintiff to accept them now. He is entitled to receive their equivalent in dollars at the time they should have been paid. There was no difference in the exchange value of rubles in December, 1917, when the defendant refused to pay to the plaintiff's sister, on the ground that it did not have the rubles, and September 1, 1918, when the defendant's American personnel left Russia. The plaintiff has stipulated that he will accept the value of the ruble on the latter date which terminates the period when the defendant could plead *force majeure,* and that it had not been informed by the State Bank that the transfer had not been made, as an excuse for delay. The debt then was to be paid by the defendant at its principal office in New York.

The value of the ruble on September 1, 1918, was proved to be thirteen cents. The plaintiff is entitled to judgment for $15,648.10, with interest thereon, which amounts up to July 12, 1927, to $8,319.57, making a total of $23,967.67.

In the course of the trial I admitted evidence which did not appear to be relevant or material, subject to a motion to strike out. My purpose in doing this was not to deprive either of the parties from having on the record all the evidence which they deemed might be material under any theory which they had, so that if the appellate courts should disagree with the theory on which the case was decided or the relevancy of the evidence, a new trial would not be necessary. The respective parties have submitted in writing motions to strike out such evidence so admitted that they deem was improperly admitted. I have passed upon these motions and indicated my ruling on the margin. Under the agreement of the parties, each is entitled to an exception to each adverse ruling. I have also passed upon the requests to find. The requests and motions to strike out are filed with my report.