**VISHIPCO LINE, Ha Nam Cong Ty, Dai Nam Hang Hai C.T., Rang Dong Hang Hai C.T., Mekong Ship Co. Sarl, Vishipco Sarl, Thai Binh C.T., VN Tau Bien C.T., Van An Hang Hai C.T., Cong Ty U Tau Sao Mai and Nguyen Thi Cham, Plaintiffs-Appellants,**

v.

**The CHASE MANHATTAN BANK, N.A., Defendant-Appellee.**

No. 1015, Docket 81–7052.

United States Court of Appeals, Second Circuit.

Argued April 29, 1981.

Decided Sept. 29, 1981.

Arthur M. Boal, New York City (Arthur M. Boal, Jr., Boal, Doti & Larsen, New York City, of counsel), for plaintiffs-appellants.

Andrew J. Connick, New York City (Toni C. Lichstein, Paul T. Shoemaker, Milbank, Tweed, Hadley & McCloy, New York City, of counsel), for defendant-appellee.

Before LUMBARD, MANSFIELD and VAN GRAAFEILAND, Circuit Judges.

MANSFIELD, Circuit Judge:

Plaintiffs appeal from a judgment of the United States District Court for the Southern District of New York entered after a non-jury trial by Judge Robert L. Carter on December 5, 1980, dismissing their claims against Chase Manhattan Bank, N.A. ("Chase"), for breach of contract. The ten corporate plaintiffs—Vishipco Line, Ha Nam Cong Ty, Dai Nam Hang Hai C.T., Rang Dong Hang Hai C.T., Mekong Ship Co. Sarl, Vishipco Sarl, Thai Binh C.T., VN Tau Bien C.T., Van An Hang Hai C.T., and Cong Ty U Tau Sao Mai—are Vietnamese corporations which maintained piastre demand deposit accounts at Chase's Saigon branch in 1975. Invoking diversity jurisdiction, they claim that Chase breached its deposit contracts with them when it closed the doors of its Saigon branch on April 24, 1975, to escape from the Communist insurgents and subsequently refused to make payment in New York of the amount owed. The individual plaintiff—Ms. Nguyen Thi Cham—is a Vietnamese citizen who purchased a six-month two hundred million piastre certificate of deposit ("CD") from Chase's Saigon branch on November 27, 1974, and claims that Chase is in breach for refusing to cash the CD in dollars in New York.

We reverse. Chase was clearly obligated to pay plaintiffs the amounts it owed them. None of the affirmative defenses raised by Chase to its conceded obligations to plaintiffs can be sustained. Under Rule 44.1, plaintiffs' failure to introduce evidence of their right to recovery under Vietnamese law governing deposit obligations is not a ground for dismissal of their claims. The evidence was sufficient to give Tran Dinh Truong standing to represent the corporate plaintiffs in this lawsuit. The record does not support Chase's claim that the new Vietnamese government became the successor in interest to the corporate plaintiffs or that the individual plaintiff Ms. Nguyen Thi Cham is disqualified from bringing her action because the funds used to buy her CD may not have been her own. Chase's defenses of impossibility and *force majeure* fail because it remained liable to discharge obligations incurred through its branch, which were never assumed by the new Vietnamese government. The present worthlessness of the South Vietnamese piastre is no barrier to recovery. Under New York law which governs, the dollar value of Chase's obligation to the corporate plaintiffs must be determined as of the date when it closed its branch without giving them the opportunity to withdraw sums owed them rather than the date of judg-

ment. The individual plaintiff, Ms. Cham, is entitled to recover the value in dollars of her CD on its due date.

From 1966 until April 24, 1975, Chase operated a branch office in Saigon. Among its depositors were the ten corporate plaintiffs, which were principally engaged at that time in providing shipping services to the U.S. Government in Southeast Asia, and the individual plaintiff, who owned a 200 million piastre CD issued by Chase's Saigon branch. Chase's operations in Saigon came to an end at noon on April 24, 1975, after Chase officials in New York determined that Saigon would soon fall to the Communists. After closing the branch without any prior notice to depositors, local Chase officials balanced the day's books, shut the vaults and the building itself, and delivered keys and financial records needed to operate the branch to personnel at the French Embassy in Saigon. Saigon fell on April 30th, and on May 1st the new government issued a communique which read as follows:

> All public offices, public organs, barracks, industrial, agricultural and commercial establishments, banks, communication and transport, cultural, educational and health establishments, warehouses, and so forth—together with documents, files, property and technical means of U.S. imperialism and the Saigon administration—will be confiscated and, from now on, managed by the revolutionary administration.

Shortly thereafter, the French embassy turned over records from the Chase branch to the new government.

Tran Dinh Truong, who is a major shareholder of most, if not all, of the ten corporate plaintiffs and who represents them here, fled South Vietnam just prior to the Communist takeover, as did Nguyen Thi Cham, the individual plaintiff. After arriving in the United States, Truong and Cham demanded that Chase repay the piastre deposits made in Saigon, but Chase refused to do so. Invoking diversity jurisdiction Truong, acting under his powers of attor-

ney, subsequently caused the plaintiffs to bring this action against Chase for breach of contract, seeking recovery of the dollar value of the piastre deposits held by its Saigon branch for them at the time it was closed, as well as the value of the certificate of deposit owned by Cham.[1]

Chase, admitting that plaintiffs had made the alleged deposits in its Saigon branch, interposed a series of affirmative defenses as grounds for denial of recovery including claims that 1) the seizure of Chase's former branch in South Vietnam by the dominant authorities in North Vietnam relieved Chase of any liability to plaintiffs, 2) Chase could not be held liable since the piastre accounts for which plaintiffs sought recovery were payable only in piastres at its Saigon branch, 3) plaintiffs lacked standing to assert their claims, and 4) payment of the claims would be illegal and is barred by Foreign Asset Control Regulations. With respect to the individual claim asserted by Nguyen Thi Cham, Chase added as a defense that the obligation of its Saigon branch had been assumed by the Government of Vietnam.

The evidence was undisputed that on April 24, 1975, the ten corporate plaintiffs held demand piastre deposits (or overdrafts) with Chase in the following sums:

| Name of Account | Balance |
| --- | --- |
| Vishipco Line . . : . . . . . . . . . . . | VN $22,995,328 |
| Ha Nam Cong Ty . . . . . . . . . | 9,053,016 |
| Dai Nam Hang Hai C.T. . . . . | 9,397,598 |
| Rang Dong Hang Hai C.T. . . | 8,974,556 |
| Mekong Ship Co. Sarl . . . . . . | 7,239,661 |
| Vishipco Sarl . . . . . . . . . . . . | (12,498,573) |
| Thai Binh C.T. . . . . . . . . . . . | 68,218 |
| VN Tau Bien C.T. . . . . . . . . . | 5,925,249 |
| Van An Hang Hai C.T. . . . . . | 87,439,199 |
| Cong Ty U Tau Sao Mai . . . . | 380,419 |

Chase also concedes that on November 27, 1974, it issued to Ms. Cham a CD in the sum of 200,000,000 Vietnamese piastres, payable on May 27, 1975, and that the CD bore interest at the rate of 23.5% per annum, payable at maturity.

---

1. A further claim made below by the corporate plaintiffs to recover the value of nine ships seized in Saigon harbor is not advanced on this appeal, and hence will not be discussed.

The district court, after hearing the evidence without a jury, dismissed the action. It held that Vietnamese law controlled the disposition of the case, in light of the extensive contacts which the depository relationships had with Vietnam and its conclusion that "the real defendant in this case is not Chase in New York but Chase's former branch bank in Saigon." The court criticized plaintiffs for not presenting any evidence of Vietnamese law giving them a right to recover and noted that such a failure had properly been held to justify dismissal in the past. However, it reached the merits because Chase, in support of its affirmative defenses, had "shouldered plaintiffs' burden" and put in some evidence of Vietnamese law relating to those defenses.

Chase first argued that Tran Dinh Truong lacked standing and capacity to bring this action in the name of the corporate plaintiffs. The court found, after hearing expert testimony on the subject, that under Vietnamese law only the manager or one holding a general power of attorney could sue on behalf of a Vietnamese corporation. Truong, as manager of Dai Nam Hang Hai C. T., had standing to sue on its behalf, but could only do so for the other nine plaintiff corporations if he could show that he held valid general powers of attorney from them. Plaintiffs did introduce into evidence two sets of powers of attorney, upon which they relied. The first set, involving four of the corporate plaintiffs (Ha Nam Cong Ty, Dai Nam Hang Hai C. T., Rang Dong Hang Hai, and Vishipco Sarl), was issued on October 22, 1970, in a letter to the Director of Chase's Saigon branch, who had requested that the five corporations then entering into a credit agreement with Chase (one of which, Cuu Long Hang Hai C. T., is not a party here) authorize Mr. Truong to act on their behalf. This letter, signed by the corporate shareholders, contained the following language:

> All those above-mentioned companies are founded [sic] 100% by our capital. We confirm that Mr. TRAN DINH TRUONG is designated as General Director of these Companies with unlimited general power to deal and borrow and lend monies. Signing contracts with your Bank—MR.

> TRAN DINH TRUONG is fully empowered to sign alone without needing a second signature to use these accounts as well as to negotiate the credit provision for the above-mentioned companies.

The second set of powers of attorney, involving six of the corporate plaintiffs (Ha Nam Cong Ty, Rang Dong Hang Hai C. T., Mekong Ship Co. Sarl, Thai Binh C. T., VN Tau Bien C. T., and Van An Hang Hai C. T.), was executed and dated April 1, 1975, and each granted Mr. Truong authority "to act on behalf of the company, with full power, in the management and operation of the said company." While we have been unable to locate in the record any power of attorney relating specifically to Vishipco Line, there is evidence in the October 22, 1970, letter to Chase that the Vishipco Line account was a global account owned collectively by the other corporate plaintiffs, and therefore could presumably be drawn upon by them acting jointly.

Despite these written powers of attorney the court found that Truong did not have authority to bring this action because he testified that his powers had not been published in the official gazette, as required by Vietnamese law. According to the court, the absence of publication made "Truong's purported authority ... subject to challenge by shareholder[s] of the corporation and the manager." The court therefore held that Truong only had standing to sue on behalf of Dai Nam Hang Hai C.T. Even this possibility was eliminated, however, when the court went on to find that

> the communist regime in Vietnam has taken over the maritime transport industry of which the plaintiff corporations were a part, and thus, the Vietnamese government is the successor in interest to plaintiff corporations [reference omitted]. Indeed, the plaintiff corporations no longer have any legal existence since under current Vietnamese law private maritime corporations have been abolished.

Since Dai Nam Hang Hai C.T., in the district court's view, had been abolished by the new regime, Judge Carter held that Truong could not bring suit on its behalf either. "The plaintiff corporations are no

longer viable entities and have no standing to sue in this court."

The court then addressed Chase's defense of impossibility and *force majeure*, and found that under Vietnamese law a bank would not be held liable to a depositor for losses suffered because of events of the type which forced Chase to close the doors of its Saigon branch on April 24th. It further held that the corporate plaintiffs' claims were flawed by their failure to show that a valid demand to withdraw funds had been made prior to April 24th. Moreover, according to the court, all property abandoned in Vietnam by those who fled in advance of the communists was confiscated by the new government, and the act of state doctrine put that confiscation beyond judicial examination.

As far as plaintiff Cham's claim was concerned, the district court held that Chase could not refuse to pay merely because the original purchase was made by Cham with funds which were not her own. It went on to hold, however, that Chase was not required to pay Cham before April 24, 1975, since the CD did not mature until some weeks later, and that by the time it had matured Chase had been replaced as debtor by the state, which now had the sole authority to decide what if any part of her deposit Cham could claim. In the district court's words: "The communist regime has appropriated the assets of Chase's Saigon branch and confiscated Cham's property. She has no claim against defendant."

## DISCUSSION

Chase here first contends that plaintiffs' claims were dismissible for failure to prove that under Vietnamese law they were entitled to recover. We disagree. The district court largely agreed with Chase's contention, stating:

---

**2.** Rule 44.1, Fed.R.Civ.P., reads as follows:

A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant mate-

When foreign law is an issue in a case, that law must be proved as a fact. *Black Diamond S.S. Corp. v. Robert Stewart & Sons, Ltd.*, 336 U.S. 386, 396–97, 69 S.Ct. 622, 627–28, 93 L.Ed. 754 (1949); *Cuba R.R. Co. v. Crosby*, 222 U.S. 473, 32 S.Ct. 132, 56 L.Ed. 274 (1912); *Walton v. Arabian American Oil Co.*, 233 F.2d 541 (2d Cir.), *cert. denied*, 352 U.S. 872, 77 S.Ct. 97, 1 L.Ed.2d 77 (1956). Plaintiffs, however, presented no evidence concerning the law of Vietnam. Such failure has resulted in dismissal of a plaintiff's claims. See *e. g., Ozanic v. United States*, 165 F.2d 738 (2d Cir. 1948); *McQuade v. Compania de Vapores San Antonio, S. A.*, 131 F.Supp. 365 (S.D.N.Y. 1955) (Goddard, J.). However, since defendant has shouldered plaintiffs' burden and offered proof of Vietnamese law, there is no need to dismiss for lack of evidence on which to determine Vietnamese law.

Although this statement reflects the law as it existed prior to the adoption of Rule 44.1 F.R.Civ.P. in 1966, it no longer governs the manner in which questions of foreign law are to be dealt with in the federal courts. Prior to 1966 foreign law questions were regarded as questions of fact, 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2441 (1971), and, as the district court's citations indicate, a number of courts took the position that a failure to prove foreign law was fatal to a claim, even if the parties had not raised the issue of the applicability of foreign law on their own. Even in this state of the law, however, federal courts frequently refused to dismiss where they were sitting in a state which provided for judicial notice of foreign law. See, *e. g., Siegelman v. Cunard White Star Ltd.*, 221 F.2d 189 (2d Cir. 1955). See generally 2A *Moore's Federal Practice* ¶ 8.17 [9.1].

Rule 44.1 of the Federal Rules of Civil Procedure,[2] which became effective in 1966,

---

rial or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

put to rest the idea that foreign law is a question of fact which has to be proven by the claimant in order to recover. It declared that "[t]he court's determination shall be treated as a ruling on a question of law."

Chase nevertheless contends that even under the more liberal standards of Rule 44.1, plaintiffs' claims should have been dismissed for failure to provide evidence of foreign law after it became clear that under New York's choice of law rules the entire case would normally be governed by Vietnamese law.

This assumes that the forum's choice of law rules are mandatory rather than permissive. See generally Sass, *Foreign Law in Federal Courts*, 29 Am.J.Comp.L. 97, 103–07 (1981). However, with the decline of the vested rights theory, see Currie, *On the Displacement of the Law of the Forum*, 58 Colum.L.Rev. 964, 1001 (1958), the movement has been away from a mandatory application of the forum's choice of law rules and toward the adoption of a discretionary rule. While, as the Advisory Committee's notes to Rule 44.1 make clear, a court is still permitted to apply foreign law even if not requested by a party, we believe that the law of the forum may be applied here, where the parties did not at trial take the position that plaintiffs were required to prove their claims under Vietnamese law, even though the forum's choice of law rules would have called for the application of foreign law. This reflects the view adopted by ourselves and other federal courts since 1966. See, e. g., *Commercial Insurance Co. v. Pacific-Peru Construction Corp.*, 558 F.2d 948, 952 (9th Cir. 1977); *Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 155 n.3 (2d Cir.), *cert. denied*, 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968); *Morse Electro Products Corp. v. S.S. Great Peace*, 437 F.Supp. 474, 487–88 (D.N.J.1977).

While Chase invoked foreign law under Rule 44.1 with respect to its own affirmative defenses only, neither party invoked foreign law with respect to Chase's basic obligations to its depositors and holders of certificates of deposit. Nor did Chase ever suggest that under Vietnamese law those obligations would not have formed a basis for recovery. Therefore, while Vietnamese law as invoked by Chase will be applied to those affirmative defenses which rest on Vietnamese law, the parties' failure to invoke foreign law with respect to the underlying obligations themselves would not mandate dismissal of the claims. Under New York law it is clear that, unless relieved of liability under one or more of the affirmative defenses asserted by it, Chase was obligated under its contracts with plaintiffs to pay them the amounts deposited with it.

Turning to Chase's affirmative defenses, it first argues that the actions brought on behalf of nine of the ten corporate plaintiffs must be dismissed because Tran Dinh Truong, who purports to represent them, has no authority under Vietnamese law to bring suit on their behalf. Chase's Vietnamese law expert, Ta Van Tai, testified that prior to April 30, 1975, only the manager or one who had been granted a general power of attorney could initiate suit on behalf of limited liability corporations such as the corporate plaintiffs. Since Truong is concededly the manager of Dai Nam Hang Hai C.T., that company's action could not be dismissed on this ground. But Chase contends that the other nine corporate plaintiffs should be dismissed, because Truong does not hold the post of manager in any of them. Despite the general powers of attorney granted to Truong by at least some of these nine corporate plaintiffs, Chase argues that these attempted transfers of authority were invalid under Vietnamese law because they were not published in the official gazette.

We disagree. The purpose of the requirement that general powers of attorney be published in the local gazette and otherwise be given special publicity is to give notice to the general public that the acts of the former manager are no longer valid and that the attorney-in-fact is now in

a position to bind the corporation. The testimony at trial was that, when publication did not take place, the holder of the power of attorney could be challenged by third parties, at which time he would "have to present some kind of proof that he is authorized by all the shareholders" to do what he is seeking to do. Since this power to challenge the attorney-in-fact would help prevent the corporation from being injured by "that person who claim[s] to represent the corporation [but who] may act unwisely," it serves as a useful safeguard to protect the interests of the shareholders. However, failure to publish a general power of attorney in the gazette renders the attorney-in-fact's authority merely voidable, not void. Once his power to act has been challenged, he may defeat that challenge by proving that he has in fact been properly authorized by the stockholders to act on their behalf. Chase has been unable to introduce any evidence which would cast doubt on the validity of the powers of attorney executed on Truong's behalf. There is no indication that Truong's actions here are other than in the interest of the corporate plaintiffs and their shareholders.

The failure to publish should not therefore be considered fatal. This basic principle is especially appropriate in the present case, since four of the corporate plaintiffs conferred their general powers of attorney on Truong *at Chase's own request.* After requiring that Truong be authorized to act on behalf of these corporations before engaging in financial dealings with them and after relying on those powers of attorney for years, Chase can hardly be heard to challenge the validity of those instruments now. Therefore, with the possible exceptions of Cong Ty U Tau Sao Mai (which does not appear to have granted any power of attorney to Mr. Truong) and Vishipco Line (as to which further proof is required),

Mr. Truong had authority to bring these actions on behalf of the corporate plaintiffs.[3]

Chase's next affirmative defense is that the plaintiff corporations have been nationalized by the Vietnamese government and therefore cannot sue on their own behalf. The district court agreed with Chase on this point, asserting that "the Vietnamese government is the successor in interest to plaintiff corporations" and that "the real defendant in this case is not Chase in New York but Chase's former branch bank in Saigon." We find the evidence of record insufficient to support these statements. In order to hold that the Vietnamese government has succeeded to the interests of the corporate plaintiffs, it must be found that the government stepped into the shoes of the corporate plaintiffs by formally assuming their assets and liabilities, thus replacing the former management. A showing that the government has merely confiscated those corporate assets which were left behind at the time of the evacuation is inadequate, since this does not constitute an assumption of the corporate mantle. A government which confiscates abandoned assets is no more the successor in interest to the departed corporation than a bank robber is to a bank victimized by him.

The evidence relied on by Chase does not support its assertions that the new government succeeded to the rights and obligations of the corporate plaintiffs and that plaintiffs no longer existed as independent entities. The testimony of Vietnamese law expert Tai on this issue was limited to the interpretation of the printed text of a radio broadcast from Hanoi discussing the governmental takeover of sea transport facilities after the fall of Saigon. As Tai correctly described the document, it merely announced

---

**3.** Plaintiffs argue on appeal that Chase's defense of lack of capacity was not pleaded with the specificity required by Fed.R.Civ.P. 9(a). Chase argues that it was raised and in the alternative that plaintiffs' failure to raise this issue below results in their being barred from raising it here. Since there is only one corporate plaintiff, Cong Ty U Tau Sao Mai, for

which Truong failed completely to show he had any authority, the issue is largely academic. With respect to that corporation we are not persuaded, in view of Chase's affirmative defenses, that Chase's failure properly to plead lack of Truong's capacity amounted to a waiver of the defense.

the decision of the [insurgent] Saigon authorities to take over all maritime transportation facilities abandoned by the owners in South Vietnam and set up a state enterprise named the South Vietnam Maritime Transport Company.

Tai was asked to express his opinion "as to the present ownership *of assets* of maritime corporations which existed prior to April 30, 1975" (emphasis supplied), and answered that

all maritime transport industry was monopolized—has been monopolized by the state. *In this sense*, all the private maritime transport corporations have been nationalized. (Emphasis supplied).

The record does not support the finding that the Vietnamese government became the successor in interest to the corporate plaintiffs. The evidence relied on is merely an announcement that abandoned assets of the maritime corporations had been seized, and that a new state company had been formed to operate them. This is wholly insufficient. There was no evidence that the Vietnamese government stepped into the corporate plaintiffs' shoes or altered in any way their corporate existence.

■ Chase next argues that the Vietnamese decree confiscating the assets which maritime corporations such as the corporate plaintiffs had left behind had the effect of seizing the piastre deposits at issue in this case. As a result, according to Chase, the corporate plaintiffs may not sue to recover the deposits because they no longer own them, and the act of state doctrine bars any challenge to the validity of the governmental seizure. We disagree. There is no evidence that plaintiffs' existence as corporate entities was terminated. Moreover, it is only by way of a strained reading of the Vietnamese confiscation announcement that one can even argue that choses in action were meant to be included. The plain meaning of the statement that

the Saigon-Gia Dinh Management Committee quickly took over the management of all maritime transportation *facilities* abandoned by their owners (emphasis supplied)

is that the seizures involved physical assets only and did not reach whatever claim the corporate plaintiffs might have on their departure for payment of the amounts owed to them by Chase.

More importantly, however, upon Chase's departure from Vietnam the deposits no longer had their situs in Vietnam at the time of the confiscation decree. As we have said in the past, "[f]or purposes of the act of state doctrine, a debt is not 'located' within a foreign state unless that state has the power to enforce or collect it." *Menendez v. Saks and Co.*, 485 F.2d 1355, 1364 (2d Cir. 1973), *rev'd on other grounds sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 2201, 48 L.Ed.2d 815 (1976). The rule announced in *Harris v. Balk*, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1905), continues to be valid on this point: the power to enforce payment of a debt depends on jurisdiction over the debtor. Since Chase had abandoned its Saigon branch at the time of the Vietnamese decree, and since it had no separate corporate identity in Vietnam which would remain in existence after its departure, the Vietnamese decree could not have had any effect on its debt to the corporate plaintiffs. As one qualified commentator has observed:

The situs of a bank's debt on a deposit is considered to be at the branch where the deposit is carried, but if the branch is closed, ... the depositor has a claim against the home office; thus, the situs of the debt represented by the deposit would spring back and cling to the home office. If the situs of the debt ceased to be within the territorial jurisdiction of [the confiscating state] from the time the branch was closed, then at the time the confiscatory decree was promulgated, [the confiscating state would] no longer [have] sufficient jurisdiction over it to affect it.... [U]nder the act of state doctrine, the courts of the United States are not bound to give effect to foreign acts of state as to property outside the acting state's territorial jurisdiction. Heininger, *Liability of U.S. Banks for Deposits Placed in Their Foreign Branch-*

*es,* 11 Law & Pol. Int'l Bus. 903, 975 (1979) (footnotes omitted) ("Heininger").

These principles have been recognized in New York. See *Manas y Pineiro v. Chase Manhattan Bank, N.A.,* 106 Misc.2d 660, 434 N.Y.S.2d 868 (Sup.Ct.N.Y.Cty.1980), where the court held that for the purpose of the act of state doctrine the situs of a debt depends on whether the parties and the *res* were in the foreign country at the time of confiscation. Since in our case Chase's branch in Saigon was neither open nor operating at the time of the confiscation and had in fact been abandoned prior to that time, the Vietnamese decree was ineffective as against Chase's debt to the plaintiffs.[4]

■ Chase's claim that Ms. Cham is without standing to maintain this action is frivolous and must be rejected, as it was by the district court. It may be true, as Chase alleges, that the piastres used by Cham to buy the CD did not belong to her but came instead from the account of one of the corporate plaintiffs. Nevertheless, the law is clear that under these circumstances a bank is barred from using this fact as a pretext for refusing to honor a CD:

> A bank which has received money from a customer and credited it to him on its books cannot be heard subsequently to allege that the deposit belonged to someone else, unless the entry was procured by fraud and the bank made it without knowledge of the material facts. 10 Am. Jur.2d *Banks and Banking* § 506 (1963).

Since Chase does not claim (and did not show below) that it was unaware of the source of funds which were invested in Cham's CD, its challenge to Cham's standing must be dismissed.

Chase next argues that under Vietnamese law its failure to repay plaintiffs' deposits in the period prior to May 1, 1975, was not a breach of its deposit contract, because the conditions prevailing in Saigon at the time rendered payment impossible. In support of this argument, Chase cites various sections of the South Vietnamese Civil Code which excuse performance under various

extenuating circumstances, as well as the provisions included in the deposit contracts used by the Saigon branch which purported to discharge the bank's responsibility for losses to depositors resulting from a variety of unexpected and uncontrollable sources.

■ This argument must be rejected for the reasons that impossibility of performance in Vietnam did not relieve Chase of its obligation to perform elsewhere. By operating in Saigon through a branch rather than through a separate corporate entity, Chase accepted the risk that it would be liable elsewhere for obligations incurred by its branch. As the official referee in the *Sokoloff* case (Harrison Tweed, of the Milbank Tweed firm) summarized the law:

> [W]hen considered with relation to the parent bank, [foreign branches] are not independent agencies; they are, what their name imports, merely branches, and are subject to the supervision and control of the parent bank, and are instrumentalities whereby the parent bank carries on its business.... *Ultimate liability for a debt of a branch would rest upon the parent bank. Sokoloff v. National City Bank,* 130 Misc. 66, 73, 224 N.Y.S. 102, 114 (Sup.Ct.N.Y.Cty.1927) (emphasis added).

U.S. banks, by operating abroad through branches rather than through subsidiaries, reassure foreign depositors that their deposits will be safer with them than they would be in a locally incorporated bank. Heininger, *supra,* at 911–12. Indeed, the national policy in South Vietnam, where foreign banks were permitted to operate only through branches, was to enable those depositing in foreign branches to gain more protection than they would have received had their money been deposited in locally incorporated subsidiaries of foreign banks. Chase's defenses of impossibility and *force majeure* might have succeeded if the Saigon branch had been locally incorporated or (more problematically) if the deposit contract had included an explicit waiver on the part of the depositor of any right to proceed

---

4. Neither *Manas* nor *Menendez* were cited to this Court by counsel despite the fact that

Chase's counsel here and in *Manas* were the same.

against the home office. But absent such circumstances the Saigon branch's admitted inability to perform did not relieve the Chase of liability on its debts in Saigon, since the conditions in Saigon were no bar to performance in New York or at other points outside of Vietnam. Nor has Chase shown that the Vietnamese government took steps to assume or cancel its branch liabilities.[5] The May 1st decree nationalizing the Vietnamese banking industry only provided that "[a]ll ... banks ... will be confiscated and from now on managed by the revolutionary administration." In addition, during discovery Chase, in response to the following interrogatory:

Interrogatory 4. When the assets were seized did the Government of Vietnam agree to pay the depositors at the Saigon Branch?

replied

Chase lacks the knowledge necessary to answer this interrogatory.

The evidence therefore can only be read as showing that the Vietnamese government confiscated the assets abandoned by Chase in Saigon, but did not thereby affect Chase's liabilities to its depositors. Under these circumstances, Justice (then Judge) Cardozo's opinion in *Sokoloff* fifty years ago applies:

The defendant's liability was unaffected by the attempt to terminate its existence and the seizure of its assets.... Plaintiff did not pay his money to the defendant, and become the owner of this chose in action, upon the security of the Russian assets. He paid his money to a corporation organized under our laws upon the security of all its assets, here as well as elsewhere. Everything in Russia might have been destroyed by fire or flood, by war or revolution, and still the defendant would have remained bound by its engagement. *Sokoloff v. National City Bank*, 239 N.Y. 158, 167, 145 N.E. 917 (1924).

As one commentator has summarized the law:

The defenses of frustration and impossibility were ... rejected at an early stage in the *Sokoloff* proceedings, and do not appear to have been successfully raised in subsequent cases involving foreign branches of U.S. banks. Rather, the well-established path from branch to home office has been followed, even if the branch has been closed, to establish an alternative means for performance. Heininger, *supra*, at 1003–04.

■ A bank which accepts deposits at a foreign branch becomes a debtor, not a bailee, with respect to its depositors. In the event that unsettled local conditions require it to cease operations, it should inform its depositors of the date when its branch will close and give them the opportunity to withdraw their deposits or, if conditions prevent such steps, enable them to obtain payment at an alternative location. See, e. g., *Sokoloff v. National City Bank, supra*, 130 Misc. at 71, 224 N.Y.S. at 112; Heininger, *supra*, at 1009–10. In the rare event that such measures are either impossible or only partially successful, fairness dictates that the parent bank be liable for those deposits which it was unable to return abroad. To hold otherwise would be to undermine the seriousness of its obligations to its depositors and under some circumstances (not necessarily present here) to gain a windfall.

■ Chase's next argument, that under New York law its non-payment must be excused because no demand was ever made prior to the closing of its Saigon branch, must also be rejected. No Vietnamese law was offered on this issue. Nor is Chase's contention supported by New York law. It is not settled that a demand is not necessary where the branch in which the deposit

5. Chase's reliance on Judge Lehman's concurrence in *Dougherty v. Equitable Life Assurance Society*, 266 N.Y. 71, 103, 193 N.E. 897 (1934), for the proposition that it is immaterial whether a foreign government seizes only a branch's assets or assumes its liabilities is misplaced.

Judge Lehman's opinion in that case, while technically a concurrence, was in fact a dissent on this point, and his position has never received majority support in New York. The generally accepted view is to the contrary. See Heininger, *supra*, at 1016 -17.

was maintained (or by which the CD was issued) has been closed. 10 Am.Jur.2d *Banks & Banking* § 450 (1963); *Sokoloff v. National City Bank,* 250 N.Y. 69, 80–81, 164 N.E. 745 (1928) (where Petrograd branch of National City Bank ceased to exist because of Soviet seizure, this made "demand useless and unnecessary" and no demand was required since it "would manifestly be futile"). Similarly, reliance on New York cases suspending or excusing performance during times of war fails, since Chase, which was ultimately liable for the debt, was never barred by the wartime conditions in Vietnam from making payment outside of Vietnam. Finally, Chase, as a national bank, can find no comfort in the provisions of § 138 of the New York Banking Law, which purport to limit in various ways the liability of *state* bank and trust companies for deposits made in overseas branches. By its own terms, § 138 is unavailable to Chase in this case, because it only applies to state, not national, banks. If this unavailability has the effect of placing national banks like Chase at a competitive disadvantage vis-a-vis state banks, as Chase alleges, the solution lies with Congress, not the judiciary.

■ Chase argues that, even if all its other affirmative defenses fail, plaintiffs cannot recover because the judgment-day rule, under which obligations to pay foreign currencies (in this case piastres) must be converted prior to payment into dollars at the rate of exchange prevailing on the day judgment is entered, applies to this case and precludes any recovery, since the piastre is now worthless. We disagree. As a federal court sitting in diversity, we must apply the currency-conversion rule employed by the courts of New York, which has followed the breach-day rule for many years. Therefore, plaintiffs are entitled to recover an amount in dollars which reflects the exchange rate between dollars and South Vietnamese piastres at the time of breach, plus statutory interest.[6]

■ It is true that federal courts sitting in *non*-diversity cases have rather consistently adopted the judgment-day rule. See, e. g., *Zimmermann v. Sutherland,* 274 U.S. 253, 47 S.Ct. 625, 71 L.Ed. 1034 (1927); *Deutsche Bank Filiale Nurnberg v. Humphrey,* 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926); *Conte v. Flota Mercante del Estado,* 277 F.2d 664, 670 (2d Cir. 1960); *Shaw, Savill, Albion & Co. v. The Fredericksburg,* 189 F.2d 952, 954–55 (2d Cir. 1951). However, this rule is substantive rather than procedural (there is no Federal Rule of Procedure on the subject) and therefore cannot be followed by federal courts sitting in diversity in states which apply the breach-day rule. See generally *Compania Engraw Commercial E. Industri-*

---

**6.** On remand, the district court will have the task of determining the exchange rate as of April 24, 1975, which should be utilized in converting the corporate plaintiffs' piastre deposits into dollars. There is evidence in the record that the official rate of exchange on April 24, 1975, was 755 piastres to the dollar. Chase will have the opportunity to introduce evidence showing that this rate was artificially low and should be replaced by a higher rate. See *Hughes Tool Co. v. United Artists Corp.,* 279 A.D. 417, 110 N.Y.S.2d 383 (1st Dep't 1952), *aff'd mem.,* 304 N.Y. 942, 110 N.E.2d 884 (1953). Statutory interest on the deposit accounts will be awarded on the dollar amount so found from April 24, 1975.

With respect to Ms. Cham's CD, which became payable on May 27, 1975, the currency rate prevailing on that date, if one existed, may be used or, if none existed, the last rate in existence prior to that date, with interest from May 27. Here again Chase should have the opportunity to show that because of deteriora-

tion in the exchange value of the piastre a different rate should be adopted. The objective, of course, is to award just compensation for the breach. See *Banco Nacional de Cuba v. Chase Manhattan Bank,* 505 F.Supp. 412, 464 (S.D.N.Y.1980) (judgment-day rule), *affirmed with modification* 658 F.2d 875 (2d Cir. 1981).

We have not looked into the question of whether payment of any judgment would be subject to the terms of the foreign asset control provisions of the Trading With the Enemy Act, 50 App. §§ 3, 5 and regulations thereunder, 31 CFR § 500.201 (1980), and the issue has not been argued on this appeal. The record reveals, however, that the Federal Reserve Bank has issued licenses to Ms. Cham unblocking the balance owed by Chase to Ms. Cham on her CD and permitting its transfer to an interest-bearing account. If similar licenses are required before Chase may transfer funds to the corporate plaintiffs we anticipate that they will be afforded the opportunity to secure their issuance.

*al S.A. v. Schenley Distillers Corp.*, 181 F.2d 876, 879 (9th Cir. 1950). Absent a federal rule, see Ely, *The Irrepressible Myth of Erie*, 87 Harv.L.Rev. 693, 698 (1974), the choice between conflicting state and federal practice must be made with a view toward fulfilling "the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna v. Plumer*, 380 U.S. 460, 468, 85 S.Ct. 1136, 1142, 44 L.Ed.2d 8 (1968). A plaintiff attempting to collect on an obligation denominated in a foreign currency that has appreciated significantly since the date the obligation was incurred would be tempted to forum-shop if he could rely on the federal courts to apply the judgment-day rule even in a diversity case. Conversely, a defendant faced with a state suit demanding payment of an obligation denominated in a currency that had depreciated significantly since the date it was incurred would be tempted to seek removal to a federal court whenever possible in order to utilize a federal judgment-day rule. *Hanna* must therefore be read as barring use of the federal judgment-rule here. In addition, it would be inequitable to allow a party to benefit or suffer from the existence of diversity jurisdiction in cases involving obligations denominated in foreign currencies when a similarly situated non-diverse party would not face such a consequence. See generally Morris, *English Judgments in Foreign Currency: A "Procedural" Revolution*, 41 Law & Contemp. Prob. 44, 48 (Spr. 1977); Becker, *The Currency of Judgment*, 25 Am.Jur.Comp.L. 152, 158 & n.31 (1977) ("Becker"). The New York law of currency conversion must therefore be applied.

With one or two rare exceptions not applicable here, see, e. g., *John S. Metcalf Co. v. Mayer*, 213 A.D. 607, 211 N.Y.S. 53 (1st Dep't 1925); *Sirie v. Godfrey*, 196 A.D. 529, 188 N.Y.S. 52 (1st Dep't 1921), New York has long favored the breach-day rule, see, e.g., *Dougherty v. Equitable Life Assurance Society*, 266 N.Y. 71, 193 N.E. 897 (1934); *Parker v. Hoppe*, 257 N.Y. 333, 339–40, 178 N.E. 550 (1931); *Richard v. American Union Bank*, 241 N.Y. 163, 149 N.E. 338 (1925); *Hoppe v. Russo-Asiatic Bank*, 235 N.Y. 37, 39, 138 N.E. 497 (1923); *Brill v. Chase Manhattan Bank*, 14 A.D.2d 852, 220 N.Y.S.2d 903, (1st Dep't 1961); *Librairie Hachette, S.A. v. Paris Book Center, Inc.*, 62 Misc.2d 873, 309 N.Y.S.2d 701, 704–05 (Sup.Ct.N.Y. Cty.1970); *De Sayve v. de la Valdene*, 124 N.Y.S.2d 143, 154 (Sup.Ct.N.Y.Cty.1953). See also *Meinrath v. Singer Co.*, 87 F.R.D. 422, 428–29 (S.D.N.Y.1980).[7] Until the New

---

7. Advocates of the judgment-day rule argue that it avoids inconsistent results, depending on whether the suit is brought in the United States or in the courts of the country in whose currency the obligation is denominated:

> Suppose that in X, a foreign nation, the plaintiff delivers a dress to the defendant in return for the latter's promise to pay him 100 units of X currency. The defendant does not pay as promised. Suppose furthermore that . . . local law governs the contract and that if suit had been brought in X the plaintiff would have recovered 100 units of X currency which at the time of breach were worth 25 U.S. dollars. Suit, however, is brought some years later in Y, a State of the United States, and by the time that the Y court renders judgment the X currency has depreciated to the point where 100 units of X currency are worth only 10 U.S. dollars. Even at this time, however, the X courts would only give the plaintiff judgment for 100 units of their currency since, with exceptions too rare to mention, courts do not take account of fluctuations in the value of their own local currency. Therefore, the Y court should give judgment for the equivalent in United States dollars at the time of judgment of 100 units of X currency. Only in this way can uniformity of result be assured. The plaintiff, in other words, should be given judgment in Y for $10.

> Restatement (Second) of Conflict of Laws § 144, Comment d (1971).

On the other hand, New York decisions reflect a conviction that the breach-day rule is the best method of making the plaintiff whole, since it puts him back in the position which he would have occupied had the defendant performed in a timely fashion, giving the plaintiff the value in U.S. dollars of the foreign currency as of the date when he should have been paid. However, the breach-day rule is favorable to a plaintiff only when the foreign currency in which the obligation was originally measured has depreciated with respect to the defendant's currency (here the dollar) during the period since the breach. If it has appreciated, the judgment rule will be more favorable.

Prior to 1975 it had long been the English rule that all court-awarded judgments were to

York courts choose to change their position on this question, we are bound to apply the breach-day rule, and do so here.

Reversed and remanded for further proceedings consistent with the foregoing.

be made in pounds sterling converted at the time of breach. See, e. g., *In re United Railways of Havana and Regla Warehouses Ltd.,* [1961] A.C. 1007. In a series of decisions culminating in *Miliangos v. George Frank (Textiles) Ltd.,* [1976] A.C. 443, however, the breach-day rule has been replaced in England by what might roughly be called a payment-day rule, which permits the plaintiff to recover either the nominal value of the obligation in the foreign currency itself or in pounds at the payment-day conversion rate. One commentator has urged that New York could and should adopt a similar rule. Becker, *supra,* at 157–59. An extended debate on the subject has subsequently appeared in English legal periodicals. See, e. g., Knott, *Foreign Currency,* 43 Mod.L. Rev. 18 (1980); Bowles & Whelan, *Judgments in Foreign Currencies: Extension of the Miliangos Rule,* 42 Mod.L.Rev. 452 (1979); Bowles & Phillips, *Judgments in Foreign Currencies: An Economist's View,* 39 Mod.L.Rev. 196 (1976).