**WELLS FARGO ASIA LIMITED, Plaintiff,**

v.

**CITIBANK, N.A., Defendant.**

**No. 84 Civ. 0996 (WK).**

United States District Court, S.D. New York.

July 2, 1985.

Skadden Arps Slate Meagher & Flom by Edwin E. McAmis, New York City, for plaintiff.

Shearman & Sterling by John E. Hoffman, Jr., New York City, for defendant.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

Plaintiff, Wells Fargo Asia Limited, moves for summary judgment for non-payment of certain overdue non-negotiable time deposits placed with the Philippine branch of defendant Citibank.

Plaintiff at all times relevant to this law suit was a bank chartered to do business by the government of Singapore and a wholly-owned subsidiary of Wells Fargo Bank, National Association, a federally chartered bank based in San Francisco, California. Citibank is a national bank chartered under the National Bank Act, 12 U.S.C. § 21 et seq., with its corporate headquarters in New York. Citibank has a branch office ("Citibank/Manila") in Manila, the Philippines.

On June 10, 1983 plaintiff placed two six-month non-negotiable U.S. $1,000,000 deposits with Citibank/Manila. The deposits were to earn interest at the rate of 10% and mature on December 9 and 10, 1983.

In October 1983, however, the Philippine government forbade repayment of the principal of certain foreign currency obligations without the prior approval of the Central Bank of the Philippines (the "Central Bank"). Citibank did not receive such approval, and did not repay the deposits on maturity.

Citibank asserts that issues of fact exist pertaining to the parties' understanding of the deposit contract, and whether or not plaintiff assumed the risk that repayment might be affected by Philippine law. Plaintiff has denied having had any understanding that it was assuming this risk and asserts in support of its motion that the deposits bore an unconditional repayment date, that repayment is overdue, and that, as a matter of law, the main office of Citibank is liable for the obligations of its Manila branch.

## BACKGROUND

### Eurodollar Transactions

At the nub of this case is the treatment to be accorded to a particular kind of time deposit denominated in U.S. dollars which is maintained in a banking institution outside of the United States (the "receiving bank"), commonly called a "Eurodollar" deposit. The case before us presents a deposit of "Asiadollars," or a dollar-denominated deposit made in an Asian country. These transactions in general bear a higher rate of interest than similar transactions within the United States. Thus, at the time plaintiff made the deposits here at issue, domestic banks were granting an interest rate of approximately 8.85%, while Eurodollar (or "Asiadollar") deposits bore an interest rate of about 10%.

The reason for this difference in interest rates is disputed. The parties agree that one of the reasons is that banks operating abroad are free from the reserve requirements imposed by the Federal Reserve Board and Federal Deposit Insurance Corporation upon banks operating within the United States. In addition, they are in accord that in the event a third person (e.g.,

a bank robber) or an act of nature (*e.g.,* flood or fire) disabled the branch bank from timely repaying deposits made with it, the main office would assume liability. The parties' view of the Eurodollar market diverges after these two areas of accord, and their differences go to the heart of the propriety of a disposition by summary judgment.

Citibank posits that aside from the category of disabling events mentioned above for which the main office would assume liability, which it terms "credit risk," there also exists a "sovereign risk" for which its main office denies liability. Such sovereign risk results from the acts of the foreign government (*e.g.,* confiscation) in whose jurisdiction the deposits are held which prevent repayment by the foreign-based branch. It suggests that the main office would not bear liability for such acts because the depositor assumes the risk that the foreign government might so act and, in effect, bargains for a higher interest rate in exchange for the risk.

The positions of the respective parties are set forth, on the one hand, in plaintiff's denial of two of Citibank's Requests for Admissions and, on the other hand, in an affidavit submitted by Citibank. The two Citibank requests for admissions (denied by plaintiff) are:

[Request 2] WF Asia [plaintiff] understood that Citibank's obligation to repay the WF Asia deposits was subject to Philippine law.

[Request 62] In deciding to place the deposits in Manila, WF Asia considered the risk of placing funds in the Philippines and the interest rate Citibank Manila offered to pay on the deposits.

The affidavit submitted by Citibank is that of Ian H. Giddy, a professor of international finance at the New York University Graduate School of Business. Professor Giddy states at ¶ 32 of his affidavit:

During the course of seminars and conventions with hundreds of international bankers during the past ten years, I have never had occasion to hear a banker deny that Eurodollar deposits are subject to the sovereign risk of the country in which the deposits are placed. Accordingly it is inconceivable to me that the staff at [Wells Fargo] Asia responsible for placing the deposits at issue did not understand that these deposits were subject to Philippine sovereign risk.

Professor Giddy explains that the existence of such a "sovereign risk" causes many depositors to place limits on the amount of Eurodollar transactions permitted in a particular bank or country.

He identifies two forms of Eurodollar deposits: negotiable deposits and non-negotiable deposits, sometimes called off-shore deposits. It is the second type of transaction which is here at issue. Because in the case of negotiable deposits (the first type) it is necessary to put potential transferees on notice of the terms of payment, it is apparently standard practice to include a legend on the certificate of deposit to the effect that the instrument is governed by and construed in accordance with the laws of the particular foreign country in which the deposit is held. In the case of non-negotiable deposits, such as those before us, this legend is, the Professor asserts, unnecessary since there are no possible transferees. He asserts, however, that all non-negotiable certificate depositers understand that the same rules apply.

Professor Giddy further teaches that Eurodollar deposits between banks are often arranged through independent brokers which collect information from banks, such as the amount of dollars they are willing to lend or borrow and the interest rate they seek or are willing to provide. Such information is shared among other potential borrowers or lenders, and the broker matches willing participants.

Payments into and from Eurodollar accounts, which are conducted through an interbank clearing system, are apparently made through telexed instructions to credit and debit demand accounts located in banks in the United States. The bank within the United States at which such demand account is kept is called the "clearing" or "correspondent" bank. This bank does not

generate the payment or repayment instructions, which originate instead with the foreign bank on whose behalf the demand account is kept. Professor Giddy maintains that no significance is attached to the identity of the clearing or correspondent bank. Through the affidavit of Donald S. Howard, Executive Vice President and Chief Financial Officer of Citicorp and Citibank, N.A., Citibank asserts that Eurodollar payments are cleared through the main office of Citibank in New York because dollar transactions are cleared through the United States, just as sterling transactions are cleared through London, and franc transactions through Paris.

Mr. Howard's affidavit in addition asserts by reference to a 1973 letter from its former president that it is "Citibank [sic] position that, as an institution, it is responsible for any breach of agreement by an overseas branch but, if the failure to perform is due to such branch's compliance with the law to which it is subject, then the failure does not constitute a breach for which either the branch or the institution as a whole is responsible." Such policy, according to Mr. Howard, was in August 1983 disseminated by the bank's policy manual to Citibank officers around the world.

### The Written Deposit Contract

The written contract between plaintiff and Citibank/Manila is made up of several confirmations and computer-generated telexes among the parties and the independent broker which arranged the deposits, and a statement of "Terms and Conditions" apparently sent to plaintiff after the deposits were placed.[1]

On June 10, 1983, Citibank/Manila indicated to the independent broker that it wished to borrow U.S. dollars that day. The independent broker's confirmation that day designated Citibank/Manila as "Borrower" and plaintiff as "Lender." Payment was to be made to "Citibank, N.A.,

New York Account Manila." Repayment was directed to "Wells Fargo International, New York Account, Wells Fargo ABIA Asia, Ltd., Singapore Account # 003–023645." On June 14th plaintiff confirmed each deposit and instructed Wells Fargo New York ("our correspondent") to pay to Citibank, New York ("customer's correspondent") the required sums. These confirmations were accompanied by computer-generated telexes. Citibank/Manila's telex states:

> Please remit U.S. DLR 1,000,000.00 to our account with Citibank New York. At maturity we remit U.S. DLR 1,050,-277.78 to your account with Wells Fargo Bank Intl. Corp. N.Y. through Citibank New York.

Plaintiff's confirmation states:

> We shall instruct Wells Fargo Bk Intl New York to pay to Citibank, N.A. 399 Park Avenue, New York, N.Y. 10022 U.S.A. Please pay to our A/C with Wells Fargo Bk Intl New York.

The independent broker's confirmation reads:

> Settlement—Citibank N.A. NYK AC Manila Repayment-Wells-Fargo Bk Intl, NYK AC Wells Fargo Asia Ltd SGP No. 003–023645.

Paragraph 6 of the statement of Citibank's Terms and Conditions provides:

> The bank shall have no responsibility for or liability to the undersigned for ... the unavailability of such funds due to restrictions on convertibility, requisitions, involuntary transfers, distraints of any character ... or other similar causes beyond the bank's control.

### The Philippine Decree

As indicated above, on October 15, 1983, the Philippine government issued a "Memorandum to Authorized Agent Banks" ("MAAB 47") which provided in full:

---

1. For the purposes of this motion only, in which we construe the submissions in a light most favorable to the party opposing summary judgment, see *United States v. Diebold, Inc.* (1962) 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176, we treat this statement as though it were part of the contract of deposit.

Any remittance of foreign exchange for repayment of principal on all foreign obligations due to foreign banks and/or financial institutions, irrespective of maturity, shall be submitted to the Central Bank thru the Management of External Debt and Investment Accounts Department (MEDIAD) for prior approval.

*Accordingly, total obligations to foreign banks/financial institutions as of the end of business hours in New York City on October 14, 1983, shall not be reduced without prior Central Bank approval.*

These measures shall apply to payments value dated during the period October 17, 1983 to January 16, 1984.

Appropriate sanctions shall be imposed on banks which fail to strictly comply with this directive. (Emphasis supplied.)

Raphael Buenventera, a senior vice-president of Citibank and the Country Corporate Officer for Citibank in the Philippines, has submitted an affidavit dated February 28, 1985 which attests in substance that following receipt of MAAB 47, he engaged in daily discussions with officials of the Central Bank, including three meetings with the governor of that institution who, in response to Mr. Buenventera's questions, "repeatedly and consistently stated that, in accordance with the requirements of [MAAB 47], foreign currency deposits placed by foreign financial institutions with Citibank Manila were frozen and that no payment would be allowed." Affidavit of Raphael Buenventera, ¶ 16. No written demand to permit payment was made prior to the maturity date of the Wells Fargo deposits.

Citibank did not pay plaintiff's deposits when they matured on December 9 and 10, 1983, and on February 10, 1984, plaintiff commenced the instant action. On February 20, 1984 Citibank/Manila applied to the Central Bank for permission to repay certain deposits, which request was granted on March 23, 1984 to the extent of repayment with Citibank/Manila's non-Philippine assets. This amounted to 46% of the sum due plaintiff. Citibank/Manila has contin-

ued to pay to the plaintiff the interest due on the remaining sum.

## DISCUSSION

The support for plaintiff's position that Citibank, N.A. is liable as a matter of law for the obligations of its branch, regardless of the ability of that branch itself to effect payment, is summed up by our Court of Appeals in *Vishipco Line v. Chase Manhattan Bank, N.A.* (2d Cir.1981) 660 F.2d 854, 863, *cert. denied* (1982) 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291, as follows:

... [I]mpossibility of performance in Vietnam did not relieve Chase of its obligation to perform elsewhere. By operating in Saigon through a branch rather than through a separate corporate entity, Chase accepted the risk that it would be liable elsewhere for obligations incurred by its branch.

\*   \*   \*   \*   \*   \*

U.S. banks, by operating abroad through branches rather than through subsidiaries, reassure foreign depositors that their deposits will be safer with them than they would be in a locally incorporated bank.

*See Garcia v. Chase Manhattan Bank, N.A.* (2d Cir.1984) 735 F.2d 645; *Sokoloff v. National City Bank* (S.Ct.N.Y.Cty.1927) 130 Misc. 66, 73, 224 N.Y.S. 102, 114.

While the parties disagree as to the reasons a Eurodollar deposit differs from one made within the United States, there is no dispute that it does. If plaintiff is correct that the holdings in the above-cited cases here apply, then Citibank, N.A. would appear to bear liability for the failure of Citibank/Manila. However, we think it clear that had plaintiff's deposits borne the legend we are informed is routinely inscribed on negotiable Eurodollar deposits, to the effect that the instrument was governed by and was to be construed in accordance with the law of the Philippines, the above-cited cases would not make the home office liable when the branch was disabled from performance because of Philippine law. We therefore find the question

before us to be whether the contract should be subjected to proof of an agreed-upon, though unstated, condition to the same effect, based on usage in the Eurodollar trade and the parties' understanding of the deposit terms which derived from such custom.

There are at least two areas in which the parties' interpretations of the terms of their contract vary, and which have material bearing on Citibank's liability. The first is whether the deposits at issue were subject to a "sovereign" risk as it is defined by Citibank. Professor Giddy finds it "inconceivable" that a sophisticated international bank depositer would claim ignorance of what he contends are the known rules of the Eurodollar deposit game, the most pertinent of which is that a consideration for the higher interest rate earned by a Eurodollar deposit is the depositer's agreement to assume a "sovereign risk." Plaintiff denies Citibank's Requests for Admissions that it had an understanding that its deposits were subject to Philippine law. It contends that the higher interest rate is a function solely of the foreign branch bank's freedom from reserve requirements.[2] Related to this dispute is the question whether, assuming Citibank's statement of Terms and Conditions was part of the contract, its disclaimer of liability for the "unavailability of funds due to restrictions on convertibility, requisitions, involuntary transfers, distraints of any character ... or other similar causes beyond the bank's control" encompassed the Philippine decree.

The second area of disagreement is over Citibank's ability to assert the affirmative defense of the Act of State doctrine.[3] As a threshhold matter, the validity of that defense turns on whether the debt was located in the Philippines with the result that the purported "taking" effected by MAAB 47 came "to complete fruition within the dominion of the [Philippine] government." *Allied Bank International v. Banco Credito Agricola de Cartago* (2d Cir.1985) 757 F.2d 516, 521, *quoting Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co.* (5th Cir.) 392 F.2d 706, 715–16, *cert. denied* (1968) 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260. If the deposit was not located in the Philippines, Citibank's defense would be unavailable. *See Allied Bank International, supra* (defense unavailable to Costa Rican bank which conceded jurisdiction in New York and agreed to pay debt in New York City); *Garcia v. Chase Manhattan Bank* (2d Cir.1984) 735 F.2d 645 (doctrine inapplicable where bank employee made explicit assurance that debt was repayable in any branch around the world); *Vishipco Line v. Chase Manhattan Bank, N.A.* (2d Cir.1981) 660 F.2d 854 (Act of State doctrine inapplicable where situs of debt was no longer Vietnam); *but see Perez v. Chase Manhattan Bank, N.A.* (1984) 61 N.Y.2d 460, 471, 474 N.Y.S.2d 689, 463 N.E.2d 5 (even where debt was payable in both United States and Cuba, Cuban government's confiscation gave rise to valid Act of State defense). If it were payable in the Philippines, however, the doctrine might prove successful. *See Braka v. Bancomer* (2d Cir.1985) 762 F.2d 222 (doctrine applies to

---

2. Plaintiff makes a cogent argument that the theory propounded by Citibank to explain the higher rate of interest borne by a Eurodollar deposit—that the depositer assumes a sovereign risk—is considerably undercut by the fact that the higher rate of interest is uniform among countries whose governments might be regarded as more or less "risky" than others. Thus, the Manila deposits here at issue bore the same rate of interest as those placed in London, Frankfurt and Singapore on the same day. Suggestive as this circumstance might be, we believe whether the validity of Citibank's position is thereby undermined is a question for the trier of fact.

3. Plaintiff maintains that because it does not challenge the validity of the Philippine government's actions pursuant to MAAB 47, but simply relies upon Citibank's liability for the debts of its branch banks under the ruling in *Vishipco Line, supra*, the Act of State doctrine is irrelevant. We do not believe, however, that this holding extends so far. In *Vishipco Line* the doctrine was not applied because it was determined that Vietnam was not the situs of the debt at the time of confiscation. 660 F.2d at 862–63. The court thus did not reach the question whether, assuming that the situs of the debt had been Vietnam, the home office would nonetheless be liable.

non-payment of deposits which on their face indicated that Mexico was the place of deposit and payment). Plaintiff maintains that the computer-generated telexes indicate the deposits were payable (and therefore sited) in New York. Citibank counters that these telexes indicate merely that the New York office was the clearing, or correspondent bank, and that such a bank cannot be deemed the repository of the debt. It asserts that it had no control over whether and when deposits were to be repaid, such instructions necessarily originating from Citibank/Manila.

We have recently been reminded that summary judgment is improper unless the terms of a contractual agreement are wholly unambiguous. *Wards Co., Inc. v. Stamford Ridgway Associates and Trim Fashions, Inc.* (2d Cir.1985) 761 F.2d 117. Thus, unless plaintiff has demonstrated that the contractual language involved is not "susceptible of at least two fairly reasonable meanings," *id.* at 120, *quoting Schering Corp. v. Home Insurance Co.* (2d Cir.1983) 712 F.2d 4, 10, "a material issue exists concerning the parties' intent, and the non-moving party has a right to present extrinsic evidence negating the meaning of the contested term." *Wards, supra* at 120; *accord Heyman v. Commerce and Industry Insurance Co.* (2d Cir.1975) 524 F.2d 1317, 1320. In the instant case, such extrinsic evidence would permissibly encompass evidence of the parties' intent, especially as it derives from custom and usage in the Eurodollar trade.

The authorities cited by plaintiff are not to the contrary. All of them concerned contracts whose terms a reasonable person could not help but understand, in contrast to the enigmatic and sparse phrases which comprise the contract before us. In addition, those cases turned on the fact that the suggested custom or usage did not support the non-moving party's interpretation, *Croce v. Kurnit* (2d Cir.1984) 737 F.2d 229, 238; *Cable Wiedemer, Inc. v. A. Friederich & Sons, Inc.* (Monroe Cty. 1972) 71 Misc.2d 443, 336 N.Y.S.2d 139, or contradicted what was otherwise a clear and unambiguous term of the contract, *Croce,*

*supra; Kologel Co. v. Down in the Village, Inc.* (S.D.N.Y.1972) 539 F.Supp. 727 (where person entitled to delivery of goods was explicitly named as "consignee," evidence of trade usage could not modify such designation); *Salzman v. Boyer Products, Inc.* (1st Dept.1973) 42 A.D.2d 531, 344 N.Y.S.2d 755 (agreement confirming unconditional nature of two loans may not be modified by evidence of oral condition), or was inconsistent with clearly established law. *Avedon v. Exstein* (S.D.N.Y.1956) 141 F.Supp. 278 (in light of long line of cases to effect that rights to delivered photograph are in customer who hired photographer and not in photographer, evidence of custom incompetent to show rights were in photographer); *Colten v. Jackes Marchais, Inc.* (Mun.Ct.1946) 61 N.Y.S.2d 269 (custom and usage cannot alter law that customer obtains proprietary rights in photo negatives).

■ We find the words and phrases of the various documents before us far from clear enough to eliminate the possibility that the parties intended to subject these deposits to the same conditions as those of negotiable deposits which, because of their transferability, explicitly bear the proviso that the deposit is subject to the law of the country in which it is placed. Similarly, we are unable conclusively to state that the deposits were not sited in the Philippines. The confirmations and telexes superficially support Citibank's theory that its New York office was the "correspondent" bank for Citibank/Manila, just as Wells Fargo Bank, National Association was the "correspondent" for plaintiff. The ultimate significance or lack thereof to be given these terms will depend on what the trier of fact determines to have been the parties' understanding of them as they were used in the Eurodollar trade. Recognizing that our task on a motion for summary judgment is "issue-finding, not issue-resolution," *United States v. One Tintoretto painting entitled "the Holy Family with Saint Catherine and the Honored Doctor"* (2d Cir.1982) 691 F.2d 603, 606; *see also Sillman v. Twentieth Century Fox* (1957) 3 N.Y.2d

**358**

395, 398, 404, 165 N.Y.S.2d 498, 499, 505 ("issue-finding rather than issue-determination is the key to the procedure"), and finding that Citibank has substantiated the existence of a genuine dispute as to material issues, *see Schering Corp., supra,* 712 F.2d at 9, we deny plaintiff's motion.

■ Related to Citibank's possible defenses of impossibility of performance and preclusion by the Act of State doctrine is whether Citibank may assert them in the first instance. MAAB 47 did not by its terms prohibit repayment of foreign deposits, but simply required that Central Bank approval be obtained prior to the making thereof. Plaintiff contends that Citibank has not shown that it ever attempted to gain such approval, and therefore cannot raise the decree to shield it from liability. After we expressed our sympathy with this position at oral argument, Citibank submitted the affidavit of Raphael Buenventera, its chief officer in the Philippines, the most persuasive portion of which we find to be his statement that, prior to the maturity date of Wells Fargo's deposits, he inquired into the effect of the decree and was unequivocally told by the Governor of the Central Bank that all foreign payments were "frozen." When the "government or other restraint does not render performance absolutely impossible, it is the duty of the promisor to make a bona fide effort to dissolve and be relieved of the restraint which operates to prevent his performance." *Brown v. J.P. Morgan* (N.Y.Cty. 1941) 177 Misc. 626, 31 N.Y.S.2d 323, 334, *rev'd on other grounds* (1st Dep't 1943) 265 A.D. 631, 40 N.Y.S.2d 229, *aff'd* (1946) 295 N.Y. 867, 67 N.E.2d 263. We believe that a trier of fact could construe Mr. Buenventera's efforts as a "bona fide effort" to obtain approval, and that the response he received demonstrated that his effort had failed. *See Dezsofi v. Jacoby* (N.Y.Cty.1942) 178 Misc. 851, 36 N.Y.S.2d 672, 674. We thus find a question of fact to exist with regard to the sufficiency of Citibank's efforts to comply with MAAB 47 and its consequent standing to raise any of its affirmative defenses.

It appearing that—at least in the several areas here enumerated—there are factual disputes which may have a material bearing on Citibank's liability, we deny plaintiff's motion for summary judgment. A status conference shall be held in Chambers on September 30, 1985, at 9:30 a.m., to discuss further proceedings in this action.

SO ORDERED.